UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/27/2025
```

------------------------------------------------------------------ X
                                 :

PATRICIA CATANIA,                    :
                                 :

                    Plaintiff,    :        1:21-cv-1257-GHW
                                 :

              -v-           :     MEMORANDUM OPINION &
                                 :          ORDER

UNITED FEDERATION OF TEACHERS, *et al.*, :
                                 :

                  Defendants.   :
                                 :
------------------------------------------------------------------ X

GREGORY H. WOODS, United States District Judge:

## I.    INTRODUCTION

        Plaintiff Patricia Catania was the principal of Middle School 224, a public school in New York City.  Ms. Catania is white.  She alleges that the defendants—a labor union and a number of its officers—conspired with a group of the school's teachers to get Ms. Catania fired and replaced with a Black principal.  To implement this conspiracy, the defendants created what Ms. Catania claims to be the false narrative that Ms. Catania wanted to prevent teachers at the school from teaching Black history.  The conspirators publicized that narrative, led protests against Ms. Catania, and lodged false complaints against her with the Department of Education.  This conduct provoked a wave of negative publicity and harassment.  Ms. Catania ultimately believed she faced a choice between resigning or facing disciplinary action for allegedly pretextual violations, so she resigned from her position.

        Ms. Catania commenced this action against the labor union and its representatives for conspiring with public school teachers to constructively discharge her in violation of her rights under the First and Fourteenth Amendments.  Defendants move to dismiss Ms. Catania's second amended complaint for failure to allege a constitutional violation, for failure to allege that Defendants are state actors, and for failure to allege the existence of a conspiracy.  Because Ms.

Catania has not adequately pleaded that her constitutional rights have been violated, the motion to dismiss is GRANTED.

## II.    BACKGROUND

### A.  Parties

On or about December 7, 2016, Plaintiff Patricia Catania began her work at Middle School 224 ("MS 224"), a New York City public school, as the school's acting principal. Dkt. No. 118 (the Second Amended Complaint or the "SAC") ¶ 74.[1]  She was promoted to become the school's principal in October 2017. *Id.* ¶ 75.  She served in that role until her resignation on or about June 5, 2019. *Id.* ¶ 276.  Defendants are the United Federation of Teachers (the "UFT") and four of its representatives, William Woodruff, Paul Egan, Janella Hinds, and Abdul Aqeel Williams. *Id.* ¶¶ 1, 38.  UFT is a labor union that represents New York City public school teachers. *Id.* ¶ 23.

Mercedes Liriano, Jacinth Scott, Jasmine Dickson, Diane Roberts, and Chantale Joseph (the "MS 224 Teachers") all taught at MS 224 during Ms. Catania's tenure. *Id.* ¶ 26.  Although Plaintiff claims that the MS 224 Teachers conspired with Defendants and acted under color of state law to violate her rights, the teachers are not parties to this action.  That is because in June 2019, Ms. Catania reached a state court settlement that released her claims against the Department of Education (the "DOE") and its employees, including the MS 224 Teachers.  *See* 1:19-cv-11245, Dkt. No. 99-2.

### B.  Ms. Catania Voices Concerns with Ms. Liriano's Lesson Plans

On or about February 7, 2019, while on school grounds, Ms. Catania spoke with Ms. Liriano about concerns she had with Ms. Liriano's lesson plans.  SAC ¶¶ 369, 376.  Ms. Catania believed that

---

[1] All facts alleged in the SAC are accepted as true for the purposes of this Rule 12(b)(6) motion. *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), of which the SAC contains many.

Ms. Liriano was "teaching Black History in her [English Language Arts] class . . . without any lesson plan at all, in clear and direct violation of the UFT/DOE contract." *Id.* ¶ 373. It was Ms. Catania's belief that Ms. Liriano was using a "historically incorrect and pedagogically outdated project list." *Id.* ¶ 374. Ms. Liriano allegedly responded to Ms. Catania's comments by going "on a loud tirade throughout the hallway and main office of the school, screaming words to the effect that Catania could not tell her she could not teach Black History." *Id.* ¶ 379.

### C. Union Employees Hold Meetings at MS 224

On January 17, 2017, Mr. Woodruff held a union meeting at MS 224. *Id.* ¶ 93. Mr. Woodruff is a district representative of the UFT who "frequently boasted and bragged that he went after and 'took out' administrators." *Id.* ¶ 303. Dozens of MS 224 employees attended the meeting, including the MS 224 Teachers. *Id.* ¶ 94. During the meeting, Mr. Woodruff criticized Ms. Catania's competence and said, "We can Malcolm X her, by any means necessary we will get her out. Change through violence." *Id.* ¶ 95. He instructed the employees that if they filed union grievances against Ms. Catania, they "can get her out." *Id.*

The following year, on February 15, 2018, after Ms. Catania's altercation with Ms. Liriano, Mr. Woodruff held another union meeting. *Id.* ¶ 96. Many of the same employees attended. *Id.* ¶ 97. Mr. Woodruff instructed them to "grieve even the tiniest thing" to get Catania removed from her position. *Id.* ¶ 98. At a union meeting held a week later, on February 22, 2018, he directed the employees to tell reporters the "false narrative" that Ms. Catania would not allow MS 224 teachers to teach Black history. *Id.* ¶ 120. At this third meeting, Mr. Williams said, "After meeting with Principal Catania she will not want to meet with me again, after I gave her a one-two punch in the face." *Id.* ¶ 115.

Ms. Liriano would "frequently" tell colleagues that "with respect to her priorities, [her] allegiance [was] to the UFT first and foremost, and that she put[] the interests of the UFT before

that of the schoolchildren at MS 224." *Id.* ¶ 63.

### D. Teachers Complain to the Department of Education and Circulate a Petition to Fire Ms. Catania

Throughout Ms. Catania's tenure at MS 224, teachers lodged complaints about her through a variety of channels. Shortly after Ms. Catania became acting principal, teachers began to file complaints with DOE's Office of Equal Opportunity. *Id.* ¶ 239. The complaints accused Ms. Catania of discriminating against teachers on the basis of race and disability. *Id.* ¶ 240. According to Plaintiff, all of the DOE complaints were "false and unsubstantiated" and were ultimately "formally and expressly determined to be unfounded." *Id.* ¶¶ 239, 241.

"[I]n lockstep with Woodruff's exhortation," teachers also continuously filed grievances against Ms. Catania with the UFT. *Id.* ¶ 245. According to Plaintiff, "none of [those grievances] had merit [and] none of [them] were substantiated." *Id.*

In March 2018, Ms. Liriano circulated a petition to all MS 224 teachers. *Id.* ¶ 217. The stated purpose of the petition was to "[g]et Catania the racist Principal removed." *Id.* That fall, Ms. Roberts sent a letter to DOE Superintendent Rafael Alvarez "falsely accusing Plaintiff therein of racist and discriminatory behavior towards her and some of the teachers at MS 224." *Id.* ¶ 246. Some teachers also called 311, a telephone reporting number established by the City of New York, "to report alleged crimes by Catania and to accuse her of being a racist." *Id.* ¶ 242.

### E. Teachers Make Disparaging Comments About Ms. Catania at School

Following the union meetings, several MS 224 Teachers made disparaging statements about Ms. Catania to their students. Throughout one school day in February 2018, Ms. Dickson told her students in multiple classes that "Catania is a racist and I don't like what she did - telling Ms. Liriano not to teach [B]lack history month," and "[s]ome of the kids are saying that she said [B]lack people are crazy." *Id.* ¶ 237. That same month, Ms. Liriano told a group of students and a teacher in the school hallway that "Catania is a racist." *Id.* ¶¶ 215–216. Shortly thereafter, Ms. Scott told a group

of students and other teachers that Ms. Catania was a racist and that Ms. Catania "kicked [her] out of [her] room." *Id.* ¶ 236. Some students also insulted Ms. Catania. During an "official observation" conducted by a DOE deputy superintendent, a student called Ms. Catania a "racist, white b**ch." *Id.* ¶ 268. The comments continued into the following year. In April 2019, Ms. Liriano "caused forty (40) students at the school to opt out of a certain exam . . . so that it would reflect badly on Catania." *Id.* ¶ 269.

Ms. Liriano also denigrated Ms. Catania to her colleagues. In December 2016, shortly after Ms. Catania became acting principal, Ms. Liriano said, in the presence of the DOE District Superintendent Elisa Alvarez, "[d]on't worry, I'll get a [B]lack principal in here." *Id.* ¶¶ 143–144. In March 2018, Ms. Liriano told a coworker in the school's main office that Ms. Catania "could be a member of the KKK" and that Ms. Catania's husband "could be a member of the Klan." *Id.* ¶ 219. Several months later, Ms. Liriano sent an "email and/or text message" to school staff that read as follows: "[t]oday was MS 224 graduation and yet again Principal Catania was up to her racist antics. Catania's continual bias rhetoric has had a profound impact on so many. Yet she continues to be a horrible leader at MS 224." *Id.* ¶ 221.

### F. Teachers Speak to the Media

Days before the second union meeting, on February 9, 2018, the UFT arranged a press conference about Ms. Catania. *Id.* ¶ 146. School parents, school employees, and multiple media organizations attended. *Id.* ¶ 145. At the press conference, Ms. Liriano made several "false statements" about Ms. Catania to reporters. *Id.* ¶ 148. She said that Ms. Catania was racist, that Ms. Catania did not allow teachers to teach Black history, and that Ms. Catania had said "that [B]lack teachers have poor knowledge of their subjects and are only good at controlling classrooms." *Id.* Ms. Scott also spoke at the conference. She called Ms. Catania a racist and asserted that Ms. Catania "doesn't belong in the school." *Id.* ¶ 225. Days later, the New York Daily News published a front-

page article about Ms. Catania, entitled "READING, WRITING & RACISM." *Id.* ¶¶ 151–52. The article featured quotes from Ms. Liriano and Ms. Scott accusing Ms. Catania of racism. *Id.* ¶¶ 151, 229.

In the following weeks, Ms. Liriano made more statements to the media in front of the school. *Id.* ¶¶ 189–210. Those statements were aired on television, posted online, and quoted in news articles. *Id.* Ms. Liriano accused Ms. Catania of instructing Ms. Liriano not to teach her students Black history. *Id.* ¶ 190. She also said that Ms. Catania had confiscated students' work on Black history and had hidden it in her office, that she had harassed students and teachers, and that she had made disparaging comments about Black people and their effectiveness as teachers. *Id.* ¶¶ 195, 202, 208.

### G.  The UFT Holds Protests Outside of the School

In the week after the press conference, Mr. Woodruff organized two protests outside of the school. *Id.* ¶ 101. The protests featured "public speeches to the crowd and public comments to the media, which speeches and comments all cast Catania in a false and negative light, including the false and negative light of being a racist." *Id.* Other "participants in and organizers of" the protests included Ms. Liriano and Ms. Scott, other teachers from the school, students, parents, community members, and local news reporters. *Id.* ¶¶ 102, 104.

Mr. Woodruff contacted members of the media to cover the protests. *Id.* ¶ 106. The subsequent media coverage "amplified and parroted the false narrative that Catania was a racist." *Id.* ¶¶ 107–08, 111. At one protest, Defendants and Ms. Liriano organized a photograph featuring Ms. Liriano and four MS 224 students. *Id.* ¶ 158. In the photograph, the students held signs bearing slogans associated with the Black Lives Matter movement and expressing the importance of teaching Black history. *Id.* ¶¶ 158–61. The photo appeared in the front-page article in the New York Daily News about Ms. Catania. *Id.* ¶ 158.

Protesters shouted death threats and insults at Ms. Catania, including "white racist b**ch" and "white devil." *Id.* ¶ 112. Ms. Catania "needed to be escorted to and from work for at least four (4) weeks" following the first protest. *Id.* ¶ 114. During the second organized protest, a news reporter "urged the protesters and students to physically and dangerously pursue Catania in a threatening manner for the benefit of the news cameras." *Id.* ¶ 110. Police officers and DOE security officers restrained the protestors and closed the street so that Ms. Catania could safely reach her car. *Id.* ¶¶ 110, 113.

### H. Union Employees Demonstrate Outside of Ms. Catania's Office

On two occasions in June 2018, groups of UFT employees, including Defendants, gathered outside of Ms. Catania's office "in a loud, disruptive, and threatening manner." *Id.* ¶¶ 122, 129. At the first demonstration, Mr. Egan stated, "We are here to intimidate her [meaning Catania] like she is intimidating our members." *Id.* ¶ 122. He also said to Ms. Catania, "I can make or break your career. I know you're not racist, but with newspapers it's all about perception and it's all about the spin I put on it." *Id.*

### I. Ms. Catania Resigns

In December 2018, Superintendent Rafael Alvarez "questioned [Catania] as to whether she could continue to lead, or effectively lead, the school" given the protests and negative media attention. *Id.* ¶ 271. In the spring of the following year, around the time Ms. Liriano had students opt out of the exam in protest, Superintendent Alvarez told Ms. Catania's union representative that "as result of the controversy caused by the Daily News articles, and the protests [] at the school, and the media coverage with respect thereto, Catania was 'radioactive' and was thus going to be removed as Principal." *Id.* ¶ 270. According to the SAC, Superintendent Alvarez began adding to Ms. Catania's personnel file "trivial, technical and/or outright false violations" as a "pretext[]" to remove her from her position. *Id.* ¶ 273. However, Plaintiff claims that "[t]he actual reason the DOE

intended to remove Catania as school Principal was not based on the pre-textual violations, but because that they had no choice but to remove her based on the false and dangerous narrative" Defendants and the MS 224 Teachers had promulgated about Ms. Catania. *Id.* ¶ 274. Plaintiff alleges that her "performance as a DOE employee was exemplary" and that "she had an unblemished work history . . . and a stellar reputation." *Id.* ¶ 286.

On or about June 5, 2019, Ms. Catania resigned from her job as principal of MS 224. *Id.* ¶ 276. Ms. Catania believed that if she did not resign, she would face discipline, including possible removal as principal and reassignment as an assistant principal in the same district, based on the allegedly pretextual violations that Superintendent Alvarez had added to her personnel file. *Id.* ¶ 275. She also resigned to escape Defendants' "wrongful campaign of terror and harassment against her in conspiracy with others." *Id.*

### J.    Procedural History

Plaintiff commenced this action, with her spouse Scott Murphy as co-plaintiff,[2] on February 11, 2021, pursuant to 42 U.S.C. §§ 1983 and 1985. Dkt. No. 1. Plaintiff alleges that Defendants engaged in a conspiracy with state actors (the MS 224 Teachers) to harass Ms. Catania and remove her from her position in violation of her rights to freedom of speech, due process, and equal protection. SAC ¶¶ 355–432.

Defendants filed their first motion to dismiss on May 25, 2021. Dkt. No. 43. Plaintiff filed her First Amended Complaint on June 15, 2021. Dkt. No. 52. Defendants filed their second motion to dismiss on July 6, 2021. Dkt. No. 68. On October 26, 2021, Magistrate Judge Kevin Nathaniel Fox issued a report and recommendation, which recommended dismissing Plaintiff's claims as precluded by the doctrine of *res judicata*. Dkt. No. 75. The action was redesignated to

---

[2] The derivative claims asserted by Mr. Murphy were dismissed on February 8, 2024, Dkt. No. 117, and were not reasserted in the SAC.

Magistrate Judge Jennifer Willis on February 1, 2022. The Court recommitted the motion to dismiss to Judge Willis with instructions on March 12, 2022. Dkt. No. 78. On October 17, 2022, Judge Willis issued a report and recommendation finding that *res judicata* does not preclude this case from proceeding. Dkt. No. 92. The Court adopted Judge Willis's report and recommendation in part and recommitted the motion to Judge Willis for further consideration of the motion to dismiss on the merits. Dkt. No. 103.

The parties further briefed the second motion to dismiss, and on April 26, 2023, Judge Willis issued a second report and recommendation recommending dismissal of the First Amended Complaint for failure to allege a constitutional violation, failure to allege that Defendants conspired with the DOE, and failure to allege that the MS 224 Teachers' actions were attributable to the state. Dkt. No. 107. Plaintiff filed objections to the report and recommendation; Defendant filed a response; and Plaintiff filed a reply with leave of the Court. Dkt. Nos. 108, 113, 116. On February 8, 2024, the Court adopted Judge Willis's second report and recommendation in part, sustained Plaintiff's objections in part, and ordered the dismissal of the First Amended Complaint for failure to adequately plead a violation of Plaintiff's constitutional rights. Dkt. No. 117.

Plaintiff filed the SAC on February 22, 2024. Dkt. No. 118. Defendants filed their third motion to dismiss on March 18, 2024. Dkt. No. 124. Defendants filed an accompanying memorandum of law that same day. Dkt. No. 126 ("MOL"). Plaintiff filed a brief in opposition on April 19, 2024. Dkt. No. 127 ("Opposition"). Defendants filed a reply on May 2, 2024. Dkt. No. 128. The Court is withdrawing the reference to Judge Willis with respect to the resolution of this motion.

## III.    LEGAL STANDARD

Under Fed. R. Civ. P. 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *DiFolco v. MSNBC Cable LLC*, 622

F.3d 104, 110–11 (2d Cir. 2010). To avoid dismissal, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A formulaic recitation of the elements of a cause of action, devoid of supporting facts, does not suffice. *Id.* To satisfy the "plausibility" requirement, the plaintiff must plead facts that permit the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). However,

> "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." A complaint must therefore contain more than "naked assertion[s] devoid of further factual enhancement." Pleadings that contain "no more than conclusions . . . are not entitled to the assumption of truth" otherwise applicable to complaints in the context of motions to dismiss.

*DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87–88 (2d Cir. 2013) (alterations in original) (quoting *Iqbal*, 556 U.S. at 678–79). Thus, a complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555, 557).

On a motion to dismiss, a court must generally "limit itself to the facts stated in the complaint." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006) (quoting *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999)). A court may also consider "documents attached to the complaint as exhibits, . . . documents incorporated by reference in the complaint . . . [and] document[s] integral to the complaint." *DiFolco*, 622 F.3d at 111 (internal quotation marks and

citation omitted). In the Rule 12(b)(6) context, "[a] court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). "The purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006). "The Rule thus assesses the legal feasibility of the complaint but does not weigh the evidence that might be offered to support it." *Id.*

## IV. DISCUSSION

### A. Section 1983 Claims

Plaintiff has failed to state a section 1983 claim because she has failed to allege a violation of her constitutional rights under either the First or Fourteenth Amendment. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). To constitute action under color of state law, "the deprivation must be caused by the exercise of some right or privilege created by the State," and "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Id.* at 49 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)).

Because Defendants are nominally private parties, Plaintiff must adequately plead that their actions are properly attributed to the state.[3]

> For the purposes of section 1983, the actions of a nominally private entity are attributable to the state . . . (1) [when] the entity acts pursuant to the coercive power of the state or is controlled by the state ("the compulsion test"); (2) when the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies ("the joint action test" or "close nexus test"); or (3) when the entity has been delegated

---

[3] Defendants argue, and Plaintiffs do not dispute, that union representatives generally are not state actors subject to section 1983 liability. *See, e.g.*, *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002) ("Labor unions . . . generally are not state actors." (citation omitted)).

a public function by the state ("the public function test").

*Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012) (quoting *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008)). A plaintiff may adequately plead such "joint action" by pleading the existence of a section 1983 conspiracy. To plead the existence of a section 1983 conspiracy, a plaintiff must allege "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002) ("To state a claim against a private entity on a section 1983 conspiracy theory, the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act. Put differently, a private actor acts under color of state law when the private actor is a willful participant in joint activity with the State or its agents." (internal citations and quotations omitted)).

Because Ms. Catania does not adequately plead that she suffered a violation of her First or Fourteenth Amendment rights, these claims under section 1983 should be dismissed. The Court need not reach the issue of whether Plaintiff has alleged the existence of a conspiracy between Defendants and state actors.

### 1. Plaintiff Fails to Adequately Plead a Violation of Her First Amendment Rights

Plaintiff fails to plead a First Amendment retaliation claim.[4] To state a claim for First Amendment retaliation, a plaintiff must allege "(1) that the speech or conduct at issue was protected

---

[4] Along with her retaliation claim, Plaintiff also alleges that Defendants violated her "First Amendment rights . . . in maintaining a good, honorable and positive reputation." SAC ¶ 265. *See also* SAC ¶ 357 (claiming that Defendants violated Plaintiff's right "to not sustain damage to her professional and personal reputation as provided in the First Amendment of the United States Constitution"). However, in her opposition brief, Plaintiff concedes that "this is not a First Amendment Claim" but rather "one brought under the Due Process [C]lause." Opposition at 10. *See Fowler v. Am. Lawyer Media, Inc.*, 46 F. App'x 54, 54 (2d Cir. 2002) (summary order) ("Speech . . . cannot violate the First Amendment rights of another individual. Rather, the relevance of the First Amendment to a defamation action is that the First Amendment protects certain defamatory speech and thus may provide a defendant with a defense to liability.").

from the particular retaliatory act alleged; (2) that the retaliatory act qualifies as an adverse action taken against the plaintiff; and (3) that there was a causal connection between the protected speech and the adverse action." *Heim v. Daniel*, 81 F.4th 212, 221 (2d Cir. 2023) (internal quotation marks and brackets omitted). Whether a public employee's speech is protected is "somewhat elusive" because public employees "must generally by necessity accept certain limitations on their First Amendment freedoms because, as government insiders, their speech can contravene governmental policies or impair the proper performance of governmental functions." *Id.* at 223 (internal quotation marks and ellipsis omitted). "Still, a public employee 'does not relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of his or her employment.'" *Id.* (quoting *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004)).

To determine whether a public employee's speech is protected, courts examine "(1) 'whether the employee spoke as a citizen on a matter of public concern' and (2) if so, whether the employer had 'an adequate justification for treating the employee differently based on his or her speech from any other member of the general public.'" *Id.* at 223–24 (quoting *Montero v. City of Yonkers*, 890 F.3d 386, 395 (2d Cir. 2018)). As to the first prong, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York*, 593 F.3d 196, 201 (2d Cir. 2010) (quoting at *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)).

Plaintiff has not alleged that she was speaking as a private citizen on a matter of public concern before she faced adverse employment action; rather, she was speaking pursuant to her official duties as principal of MS 224. When Plaintiff spoke to Ms. Liriano about Ms. Liriano "utilizing a historically incorrect and pedagogically outdated project list," SAC ¶¶ 373–76, she was doing so pursuant to her duties as a principal, which includes disciplining teachers. The same is true

for when Plaintiff "wrote letters to file and otherwise disciplined" the MS 224 Teachers. *Weintraub*, 593 F.3d at 203 (a teacher filing a "grievance was pursuant to his official duties because it was part-and-parcel of his concerns about his ability to properly execute his duties as a public school teacher—namely, to maintain classroom discipline" (internal citation and quotation marks omitted)). Plaintiff is simply incorrect that this was "public speech" merely "because said speech was spoken in front of at least one person other than Ms. Liriano." SAC ¶ 377. *See Weintraub*, 593 F.3d at 203. And while Plaintiff points out that "the manner in which public schoolchildren are educated in public schools" is a matter of public concern, SAC ¶ 378, this fact does not affect the analysis here. "The controlling factor . . . is that [Plaintiff's] expressions were made pursuant to [her] duties" as the principal of MS 224. *Garcetti*, 547 U.S. at 421.

Plaintiff cannot escape this rule by claiming that she was "wearing two hats." Opposition at 4. The Supreme Court recognized that it is "essential that [teachers] be able to speak out freely" on the issue of school policy. *Garcetti*, 547 U.S. at 421; *see also Pickering v. Bd. of Ed. of Tp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 573 (1968) ("[T]he interest of the school administration in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public."). However, Plaintiff does not allege that she was speaking at a public meeting or—as in *Pickering*—writing in the local newspaper on the general direction of the school, the quality of educational instruction, or particular policy priorities. Her allegations do not show that she was "contribut[ing] to public debate." *Pickering*, 391 U.S. at 573. Rather, she was speaking directly to a teacher, who she supervises as a principal, on that individual teacher's inadequate lesson plan. This conduct falls squarely in the category of speech "execut[ing] one of her core duties" as principal. *Weintraub*, 593 F.3d at 203. "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Garcetti*, 547 U.S. at

14

421–22.  Thus, Plaintiff's alleged speech is not protected by the First Amendment.[5]

### 2. Plaintiff Fails to Adequately Plead a Violation of Her Right to Due Process Under the Fourteenth Amendment

Plaintiff fails to plead a Due Process violation because she does not adequately allege that she had a property interest in her employment at MS 224 and because an adequate post-termination hearing was available after the deprivation of her liberty interest.  "A procedural due process claim is composed of two elements:  (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process."  *Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 218 (2d Cir. 2012).  The property or liberty interest must be a "constitutionally protected interest."  *Abramson v. Pataki*, 278 F.3d 93, 99 (2d Cir. 2002).

### a. Plaintiff Does Not Adequately Allege That She Had a Property Interest in Her Employment at MS 224

Plaintiff's allegations do not adequately plead that she had a property interest in continued employment as a principal at MS 224.  "In order to have an interest protectable under the Constitution, a person must have 'legitimate claim of entitlement to it.'"  *Id.* (quoting *Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564, 577 (1972)).  "Employees at will have no protectable property interest in their continued employment."  *Id.*  "[A] person may possess a protected interest in public employment if contractual or statutory provisions guarantee continued employment absent sufficient cause for discharge or he can prove a de facto system of tenure."  *Id.* (internal quotation marks omitted).  "Under New York law, it is well settled that a probationary employee, unlike a permanent employee, has no property rights in his position and may be lawfully discharged without a hearing and without any stated specific reason."  *Finley v. Giacobbe*, 79 F.3d 1285, 1296 (2d Cir. 1996)

---

[5] Plaintiff also alleges that "on prior occasions, [she] had spoken publicly on other matters of public concern, e.g., the topics of disciplining underperforming teachers at MS 224, the overall performance of MS 224, and the performance of both students and teachers."  SAC ¶ 380.  This conclusory allegation with no dates, context, or supporting facts is not sufficient to state a retaliation claim.  This allegation does not "give [the defendants] fair notice of what [plaintiff's] claims are and the grounds upon which they rest."  *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 514 (2002).

(internal quotation marks omitted).

### i. Plaintiff Did Not Have a Statutory Guarantee of Employment

Plaintiff has failed to plead a statutory guarantee of continued employment absent good cause for termination.  New York Education Law § 2573(1)(b)(ii) provides that a probationary principal's service "may be discontinued at any time during the probationary period."  The Second Circuit has repeatedly held that such probationary employees do not have property interests in their employment.  *See Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 629 (2d Cir. 1996) ("New York law provided no basis for Donato to believe that she had a legitimate claim of entitlement to continued employment as an assistant principal.  Rather, the law expressly permitted her termination at any time during her probationary period."); *Cummings v. City of New York*, No. 21-1380, 2022 WL 2166585, at *2 (2d Cir. June 16, 2022) (summary opinion) (holding that a teacher "did not have a property interest in her probationary employment"); *Walsh v. Suffolk Cnty. Police Dept.*, No. 06-cv-2237 (JFB)(ETB), 2008 WL 1991118, at *7 (E.D.N.Y. May 5, 2008), *aff'd*, 341 Fed. App'x 674 (2d Cir. 2009) ("It is well settled in New York that a probationary employee, unlike a permanent employee, has no property rights in his position and may be lawfully discharged without a hearing and without any stated specific reason.").

While Plaintiff argues that § 2573(1)(b)(ii) sets out a process for discontinuing a probationary principal's service, the existence of such a process does not change the nature of her probationary employment.  Nothing in the statute states that a probationary principal can only be fired for cause. The *Donato* court held that a probationary assistant principal did not have a property interest in her employment, even though the New York statute at issue in that case contains the same language about discontinuance being "on the recommendation of the superintendent of schools, by a majority vote of the board of education."  N.Y. Educ. Law § 3012(1)(a).  *See Donato*, 96 F.3d at 629 ("[Section] 3012 expressly states that a probationary appointee may be terminated at any time.").

16

Even though Plaintiff alleges that the process—recommendation by the superintendent and majority vote of the board of education—was not followed in this case, "'property' cannot be defined by the procedures provided for its deprivation." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985) ("The categories of substance and procedure are distinct. Were the rule otherwise, the [Due Process] Clause would be reduced to a mere tautology."); *see also Cummings*, 2022 WL 2166585, at *2 ("Cummings did not allege a valid property interest. She did not have a property interest in her probationary employment . . . or in specific Department of Education procedures." (citations omitted)).

To the contrary, the familiar analysis proceeds in two steps: first, determine whether there is a property interest; second, determine what procedures are due before deprivation. *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 313 (2d Cir. 2002). Because Plaintiff served at will—she could be relieved "at any time" without cause—she did not have a property interest in her employment. *See Donato*, 96 F.3d at 629. Because she did not have a property interest in her employment, she does not have a constitutional guarantee to any particular procedure—in this case a recommendation from the superintendent of schools or a vote of the board of education. *See Cummings*, 2022 WL 2166585, at *2. That the statute sets out an administrative procedure for termination does not give her an entitlement to her probationary employment.

The doctrine of "*de facto* tenure" does not save Plaintiff's claim. Plaintiff is correct that a property interest may be "acquired under a '*de facto* tenure program.'" *Russell v. Hodges*, 470 F.2d 212, 216 (2d Cir. 1972) (quoting *Perry v. Sindermann*, 408 U.S. 593, 600 (1972)). However, "a mere 'unilateral expectation' of continued employment [is] not sufficient." *Id.* (quoting *Sindermann*, 408 U.S. at 603). *De facto* tenure "result[s] from 'the existence of rules and understandings, promulgated and fostered by state officials, that may justify his legitimate claim of entitlement to continued employment.'" *Id.* (quoting *Sindermann*, 408 U.S. at 602). Regardless of her allegedly "exemplary"

performance and "unblemished work history," SAC ¶ 286, Plaintiff "can point to no District 'policies and practices' sufficient to create an implied understanding" that these qualities guaranteed that she would be given tenure.[6] *Donato*, 96 F.3d at 629 (quoting *Sindermann,* 408 U.S. at 603).[7] Her unilateral "reasonable expectation" that she "would have [] been recommended for permanent appointment" is not sufficient to allege that she had quasi-tenure. SAC ¶¶ 316, 326.

### ii.  Plaintiff Did Not Have a Contractual Guarantee of Employment

Plaintiff has also failed to plead a contractual guarantee of continued employment. "A collective bargaining agreement may give rise to a property interest in continued employment." *Ciambriello*, 292 F.3d at 314. Plaintiff alleges that "[u]nder the express terms of [her collective bargaining agreement], [she] could not be removed from her position at MS 224 except for cause or good cause." SAC ¶ 319. However, Plaintiff failed to provide the collective bargaining agreement as an exhibit or to even cite the relevant section of the collective bargaining agreement. Defendants, on the other hand, provide what they assert to be "all [collective bargaining agreements] that were in effect during the relevant times." MOL at 9. These collective bargaining agreements purport to be effective from July 2003 to January 2023. *See* Dkt. Nos. 125-1, 125-2, 125-3. The Court considers these documents as incorporated by reference or otherwise "integral to the complaint" because the SAC "relies heavily on [their] terms and effect." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016); *see* SAC ¶ 324 ("Catania's employment, or continued/continuing employment, was otherwise

---

[6] The "requirements under Section 2573(5)(b)" that Plaintiff alleges she "would have continued to meet," SAC ¶ 316, are not the kind of "rules and understandings, promulgated and fostered by state officials" that justify her expectation of continued employment. *Russell*, 470 F.2d at 216 (quoting *Sindermann,* 408 U.S. at 602). Rather, section 2573(5)(b) provides for the superintendent of schools to "recommend[] . . . those persons who have been found competent, efficient and satisfactory." N.Y. Educ. Law § 2573(5)(b). These are subjective measures that Plaintiff cannot be certain she would meet. *See Sindermann*, 408 U.S. at 603 (holding that "a mere subjective expectancy" is not protected by procedural due process). The state law gives the superintendent discretion in recommending probationary employees for tenure; thus, "state law clearly rejects any inference of legitimate entitlement." *Baden v. Koch*, 638 F.2d 486, 493 (2d Cir. 1980).

[7] Plaintiff points the Court to her allegations at SAC ¶¶ 326–334. These paragraphs constitute "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

guaranteed by contract or agreement.").[8]  Nowhere in these agreements is there a suggestion that a probationary employee such as Plaintiff cannot be removed except for "cause or good cause."  SAC ¶ 319.

Plaintiff's references to other contractual rights are similarly inadequately pleaded.  Plaintiff asserts for the first time in her opposition brief and accompanying declaration that "she was appointed via a permanent appointment process known as 'C-30.'"  Opposition at 9; *see* Dkt. No. 127-1, Declaration of Patricia Catania, ¶ 4.  This status, she asserts, gave her "more rights and security in her position than an interim acting principal would have had."  Dkt. No. 127-1 ¶ 4.  And it is her "belie[f] that said permanent appointment could not be undone absent 'good cause.'"  *Id.* There is no reference to any permanent appointment or "C-30" process anywhere in the SAC.  "It is well-settled that a plaintiff 'cannot amend [her] complaint by asserting new facts or theories for the first time in opposition to [a] motion to dismiss.'"  *Peacock v. Suffolk Bus Corp.*, 100 F. Supp. 3d 225, 231 (E.D.N.Y. 2015) (quoting *K.D. v. White Plains Sch. Dist.*, 921 F.Supp.2d 197, 209 n.8 (S.D.N.Y.2013)).  Therefore, the Court does not accept Plaintiff's assertions about her appointment through the C-30 process and about the protections she believes that process affords her.

Even if the Court were to consider this new allegation that Plaintiff was appointed through Regulation C-30 of the Chancellor of the New York City Department of Education, issued May 21, 2015, ("Regulation C-30"), Plaintiff has no basis for her "belief" that this regulation provided her termination protections.  Regulation C-30 "governs the process of selection, assignment, and appointment of Principals and Assistant Principals."  Regulation C-30, which was effective through

---

[8] Additionally, in her opposition brief, Plaintiff failed to dispute the authenticity of these documents or their relevance to Plaintiff's allegation.  Therefore, Plaintiff has "conceded . . . by silence" that these are the operative collective bargaining agreements referenced in the SAC.  *In re UBS AG Securities Litig.*, No. 07-cv-11225 (RJS), 2012 WL 4471265, at *18 n.18 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's and Firemen's Ret. System v. UBS AG*, 752 F.3d 173 (2d Cir. 2014).  *See also Sucesores de Don Carlos Nunez y Dona Pura Galvez, Inc. v. Societe Generale, S.A.*, No. 1:20-cv-851 (MKV), 2023 WL 2712505, at *6 n.8 (S.D.N.Y. Mar. 30, 2023), *aff'd sub nom. Moreira v. Societe Generale, S.A.*, 125 F.4th 371 (2d Cir. 2025) ("Plaintiffs have conceded that point by failing to dispute it in their opposition brief.").

Plaintiff's appointment at MS 224, does not provide that principals appointed pursuant to that process may only be terminated for cause. In fact, Regulation C-30 does not address termination at all. Further, the case law does not support the view that a principal appointed through the C-30 process has employment protections sufficient to create a property interest in continued employment. *See Williams v. New York City Dept. of Educ.*, No. 19-cv-1353 (CM), 2019 WL 4393546, at *17 (S.D.N.Y. Aug. 28, 2019) (holding that a "probationary principal . . . does not have a legitimate claim of entitlement to her position," even though she was appointed through the C-30 process (internal quotation marks omitted)). Plaintiff has therefore failed to adequately plead that she had a contractual guarantee of continued employment at MS 224.

### b. Plaintiff Was Not Deprived Due Process for Her Stigma Plus Claim

Plaintiff has failed to adequately plead that her interest in her reputation for future employment was deprived without due process. Though a probationary employee has no constitutionally protected property interest in her employment, she may be able to demonstrate a deprivation of a liberty interest. *Segal v. City of New York*, 459 F.3d 207, 212–13 (2d Cir. 2006). "[A] probationary employee can 'invoke the protections of the Due Process Clause' where that employee has suffered a loss of reputation 'coupled with the deprivation of a more tangible interest, such as government employment.'" *Id.* at 212 (quoting *Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004)). "Such an action is referred to as a stigma-plus claim; it involves an 'injury to one's reputation (the stigma) coupled with the deprivation of some tangible interest or property right (the plus), without adequate process.'" *Id.* (quoting *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003)).

### i. Plaintiff Has Pleaded a Stigma Plus Injury

To adequately plead the "stigma" component of a stigma-plus claim based on termination from public employment a plaintiff must plead three elements:

> *First*, the plaintiff must . . . show that the government made stigmatizing statements about [her]—statements that call into question [the] plaintiff's good name, reputation,

honor, or integrity. . . .  *Second*, a plaintiff must prove these stigmatizing statements were made public.  *Third*, the plaintiff must show that the stigmatizing statements were made concurrently with, or in close temporal relationship to, the plaintiff's dismissal from government employment.

*Id.* (internal citations and quotation marks omitted) (emphasis in original).

Defendants do not dispute that Plaintiff's good name and reputation were called into question by statements portraying Plaintiff as a racist.  Nor do Defendants dispute that these statements were made public; they were intentionally made public at press conferences, during public protests, and in media interviews.  However, Defendants do dispute that they and the MS 224 Teachers made the stigmatizing statements in their capacity as government actors.  Defendants argue that the stigmatizing statements were made in Defendants' and the MS 224 Teachers' private capacities.  MOL at 10.  However, Defendants offer no case law delineating between government action and private action in the stigma-plus context.  To the contrary, the courts in this Circuit have repeatedly held that a stigma-plus claim is actionable where a government employee without direct supervisory authority over a plaintiff makes stigmatizing public statements about the plaintiff in connection with their termination.  *See Velez v. Levy*, 401 F.3d 75, 90 (2d Cir. 2005) (upholding a stigma-plus claim where school board members, who could not directly fire a teacher, instead spoke to the press with allegedly false allegations with the purpose of getting the teacher fired); *Chiaravallo v. Middletown Transit Dist.*, 561 F. Supp. 3d 257, 273 (D. Conn. 2021) (recognizing a stigma-plus claim where the mayor publicly alleged mismanagement by a worker of a public corporation over which the mayor has no supervisory authority).[9]  Plaintiff has alleged that the MS 224 Teachers, conspiring with Defendants, made public statements impugning her reputation in an effort to force her termination.  Consistent with *Velez*, this conduct is sufficient to satisfy the first two elements of a

_____

[9] Thus, contrary to Defendants' argument, there need not be an employer-employee relationship between Defendants and Plaintiff.  *See Velez v. Levy*, 401 F.3d 75, 89 (2d Cir. 2005) ("[E]ven where a 'stigma' and 'plus' are not imposed by the same actor, a stigma-plus claim may be valid if the 'stigma' and 'plus' were connected.").

stigma-plus claim.

And Plaintiff has adequately pleaded a temporal relationship between the stigmatizing statements and her termination. As Defendants point out, approximately fifteen months passed between the public statements in February and March 2018—made at rallies, at protests, in interviews, and in news reports—and Plaintiff's resignation in June 2019.[10] However, the widespread publicity of the stigmatizing statements at the time and the reverberations of those statements throughout the ensuing months may plausibly create such a nexus that "the discharge itself may become stigmatizing in the public eye." *Ulrich v. City and County of San Francisco*, 308 F.3d 968, 983 (9th Cir. 2002); *see Velez v. Levy*, 401 F.3d 75, 89 (2d Cir. 2005) (quoting *Ulrich*, 308 F.3d at 983) ("[A] liberty interest may be implicated, even though the 'stigma' and 'plus' were not imposed at precisely the same time."). Plaintiff alleges that the controversy caused by the events of early 2018 "had still not dissipated at MS 224" by November of 2018. SAC ¶ 267. Students were, allegedly inspired by the defamatory statements, still hurling profanity at Plaintiff in front of DOE officials and engaging in protests, and in April 2019, students agreed to opt out of an exam in protest. *Id.* ¶¶ 268–69. In the spring of 2019, Superintendent Alvarez stated that the controversy caused by the public statements and media coverage made Plaintiff "radioactive," so she was "thus going to be removed as Principal." *Id.* ¶ 270. Because the 2018 statements created such a controversy for MS 224 that Superintendent Alvarez felt that he still needed to take action in the spring of 2019, a jury could reasonably conclude that the public would view the statements as related to her resignation. *See Abelli v. Ansonia Bd. of Educ.*, 987 F. Supp. 2d 170, 175 (D. Conn. 2013) ("Although there is a gap between when these statements were made and Plaintiff's termination, the allegations . . . plausibly

---

[10] In the one case cited by Defendants, the defamatory statement was published five months *after* termination, and the statement "indicate[d] that it could not have been a factor in the decision not to re-appoint" the plaintiff. *Martz v. Inc. Village of Valley Stream*, 22 F.3d 26, 32 (2d Cir. 1994). This case is therefore not persuasive on the issue of whether fifteen months is a close enough temporal relationship.

suggest that these statements were made 'in the course' of Plaintiff's rather protracted termination. Importantly, the statements related to the basis for Plaintiff's termination, which could satisfy the requirement that Plaintiff demonstrate that there was a 'proper nexus' between her termination and the statements.").

### ii. Plaintiff Was Afforded Due Process

Plaintiff has failed to plead that, even if she suffered a stigma-plus injury, she was deprived of due process. "[I]t is not enough that the plaintiff has demonstrated the deprivation of her liberty interest; in order to bring a successful stigma-plus claim, the plaintiff also must demonstrate that her liberty was deprived without due process of law." *Segal*, 459 F.3d at 213. "Stated differently, the availability of adequate process defeats a stigma-plus claim." *Id.* And "in this case involving an at-will government employee, the availability of an adequate, reasonably prompt, post-termination name-clearing hearing is sufficient to defeat a stigma-plus claim." *Id.* at 214.

Because Plaintiff had the opportunity to obtain a name-clearing hearing under N.Y. C.P.L.R. § 7801 (an "Article 78 hearing"), she was not deprived of due process. An Article 78 hearing "provides the mechanism for challenging a specific decision of a state administrative agency." *Campo v. New York City Employees' Ret. System*, 843 F.2d 96, 101 (2d Cir. 1988). The availability of "[a]n Article 78 proceeding provides the requisite post-deprivation process—even if [the plaintiff] failed to pursue it." *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 121 (2d Cir. 2011) (affirming dismissal of a stigma-plus claim).

Even though Plaintiff resigned from her position, leaving "no . . . decision by DOE" to challenge, Opposition at 10, an Article 78 hearing allows a party to challenge a constructive discharge. *See* SAC ¶¶ 284–85 (alleging Plaintiff was "forced" to resign). An Article 78 hearing gives an employee "a meaningful opportunity to challenge the voluntariness of [her] resignation." *Giglio v. Dunn*, 732 F.2d 1133, 1135 (2d Cir. 1984) (where the employee was a tenured teacher). "Had an

Article 78 hearing been held, the court, with all the facts before it, could have determined whether [the plaintiff's] resignation was coerced and, avoiding the constitutional thicket, could have ordered such reinstatement and monetary relief as was appropriate." *Id.* at 1134; *see also Dodson v. Bd. of Educ. of the Valley Stream Union Free Sch. Dist.*, 44 F. Supp. 3d 240, 248 (E.D.N.Y. 2014) ("[I]t is well-settled that where a New York state employee resigns and later contends that his resignation was not voluntary, . . . New York has provided an opportunity for a post-deprivation hearing in the form of an Article 78 proceeding."); *Walsh v. Suffolk Cnty. Police Dept.*, No. 06-cv-2237 (JFB) (ETB), 2008 WL 1991118, at *14–15 (E.D.N.Y. May 5, 2008), *aff'd*, 341 Fed. App'x 674 (2d Cir. 2009) (dismissing a stigma-plus claim on the basis of the availability of an Article 78 hearing where a police officer resigned over an investigation and subsequent stigmatizing statements by fellow officers). Therefore, Plaintiff is incorrect that an Article 78 hearing "offers no remedies whatsoever to Plaintiff." Opposition at 11. She could have challenged the voluntariness of her resignation and then raised the question whether the DOE's and Superintendent Alvarez's decision to force her resignation "was made in violation of lawful procedure . . . or was arbitrary and capricious." N.Y. C.P.L.R. § 7803.

While Plaintiff argues that she could not have "sued" any of the Defendants in an Article 78 proceeding and that her claim does not require "exhausting state judicial or administrative remedies," Opposition at 11, Plaintiff misunderstands the due process requirement. When a plaintiff brings a due process challenge "based on random, unauthorized acts by state employees," due process exists "so long as the State provides a meaningful post[-]deprivation remedy" for the deprivation. *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996). The asserted stigma-plus liberty deprivation is "a loss of reputation" and employment. *Segal*, 459 F.3d at 212. Thus, the question is not whether the state procedures allow Plaintiff to sue the Defendants; rather, the question is whether the proceeding could have mitigated the constitutional

injury to Plaintiff's reputation or loss of employment.  *Hellenic Am. Neighborhood*, 101 F.3d at 881 ("An Article 78 proceeding is adequate for due process purposes even though the petitioner may not be able to recover the same relief that he could in a § 1983 suit.").  And a post-termination name clearing procedure does just that.  *See Segal*, 459 F.3d at 214.

As for Plaintiff's argument that she need not exhaust state remedies, this argument also misses the mark.  Plaintiff's citation to *Kraebel v. New York City Dep't of Hous. Preservation and Dev.*, 959 F.2d 395, 404 (2d Cir. 1992), is inapposite.  In fact, the Second Circuit explicitly referenced the relevant part of *Kraebel* when it held that a plaintiff "can find little comfort in the general rule that § 1983 allows plaintiffs with federal or constitutional claims to sue in federal court without first exhausting state judicial or administrative remedies."  *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 881 (2d Cir. 1996) (citing *Kraebel*, 959 F.2d at 404).  The Second Circuit held that "[its] decisions holding that an Article 78 proceeding constitutes an adequate post[-]deprivation procedure under the Due Process Clause are consistent with this general rule."  *Id.*  "If there *is* a constitutional violation, federal courts are available to hear § 1983 suits despite the availability of adequate state procedures."  *Id.* at 882 (emphasis in original).  However, "there *is no* constitutional violation (and no available § 1983 action) when there is an adequate state post[-]deprivation procedure to remedy a random, arbitrary deprivation of property or liberty."  *Id.* (emphasis in original).

Because Plaintiff could have pursued an Article 78 hearing—but chose not to—in order to clear her name and seek reinstatement after her resignation, Plaintiff was not deprived of due process.

### 3.  Plaintiff Has Failed to Adequately Plead an Equal Protection Violation

Plaintiff also fails to adequately plead a Fourteenth Amendment equal protection violation. "To state a discrimination claim under the Fourteenth Amendment Equal Protection

Clause . . . plaintiffs must sufficiently allege that defendants acted with discriminatory intent." *Burgis v. New York City Dept. of Sanitation*, 798 F.3d 63, 68 (2d Cir. 2015). "[A] plaintiff pursuing a claim for employment discrimination under § 1983 . . . must establish that the defendant's discriminatory intent was a 'but-for' cause of the adverse employment action or the hostile environment." *Naumovski v. Norris*, 934 F.3d 200, 214 (2d Cir. 2019). "Naked" and "conclusory" allegations of discriminatory intent are insufficient, *Albert v. Carovano*, 851 F.2d 561, 572 (2d Cir. 1988); "the plaintiff must thus 'present facts sufficient to support an inference of intentional discrimination,'" *Islam v. Melisa*, No. 18-cv-2535 (KAM) (LB), 2020 WL 1452463, at *12 (E.D.N.Y. Mar. 24, 2020) (quoting *Howard v. City of New York*, 602 F. App'x 545, 557 (2d Cir. 2015)). *See also Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002) ("[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct.").

Plaintiff's allegations of intentional discrimination are either conclusory or not attributable to Defendants. Plaintiff alleges that Defendants and the MS 224 Teachers publicly defamed her and tried to get her terminated because she is a white woman. However, Plaintiff "fail[s] to allege in other than conclusory fashion any specific instances of discrimination" on this basis. *Burgis v. New York City Dept. of Sanitation*, 798 F.3d 63, 68 (2d Cir. 2015). Plaintiff repeatedly alleges that Defendants conspired to cause her removal "because [] Plaintiff is a member of the White/Caucasian race" and because they "specifically wanted to replace a White school Principal with a school Principal of color." SAC ¶ 9; *see also* SAC ¶¶ 65, 90, 140, 214, 303, 355, 359, 427. In the seminal case on pleading standards, the Supreme Court stated that simply alleging that conduct was committed "on account of . . . race" are "bare assertions" that "amount to nothing more than a formulaic recitation of the elements of a constitutional discrimination claim." *Ashcroft v. Iqbal*, 556

U.S. 662, 680–81 (2009) (internal quotation marks omitted). In Plaintiff's third complaint, she fails to plead facts that "give plausible support to a minimal inference of discriminatory motivation" by Defendants. *Buon v. Spindler*, 65 F.4th 64, 83 (2d Cir. 2023). *See Manolov v. Borough of Manhattan Community College*, 952 F. Supp. 2d 522, 532 (S.D.N.Y. 2013) ("Nowhere in either the [c]omplaint or his opposition papers does Manalov allege that any defendant referred to his race or gender, nor does he recite any other fact from which race- or gender-based discriminatory intent reasonably could be inferred.").

The instances of race-based profanity cited in the SAC are not attributable to the co-conspirators and thus not relevant to the analysis. Plaintiff alleges that only unidentified protestors and students—not Defendants nor the MS 224 Teachers—levied slurs and biased profanities at Plaintiff. SAC ¶¶ 109, 112, 268. The animus of these unidentified protestors and students says nothing about "the defendants' discriminatory intent." *Naumovski*, 934 F.3d at 214.

Ms. Liriano's 2016 statement that she will "get a [B]lack Principal in here," SAC ¶ 143, is alone insufficient to adequately plead a section 1983 claim against Defendants. Unlike Title VII, "§ 1983 does not permit [] vicarious liability." *Naumovski*, 934 F.3d at 212; *see also Iqbal*, 556 U.S. at 676 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). Thus, to be held liable for the discriminatory acts of a third party, the defendant must "*knowingly* further[] the discriminatory intent of a third party." *Naumovski*, 934 F.3d at 221 n.84 (emphasis added); *cf. Wong v. Yoo*, 649 F. Supp. 2d 34, 71 (E.D.N.Y. 2009) (brackets omitted) ("[I]n the § 1985(3) context, 'intentional discrimination must motivate the group of conspirators.' Where 'only one conspirator was so motivated, the conspiracy does not fall within the scope of § 1985(3).'" (quoting *Straker v. Metro. Transit Auth.*, No. 03-cv-1756, 2005 WL 3287445, at *3 (E.D.N.Y. Dec. 5, 2005))).

There is no allegation that Defendants operated under the same discriminatory motive that

can be inferred from Ms. Liriano's 2016 statement.  It is not even alleged that any of the co-conspirators heard Ms. Liriano's 2016 statement.  SAC ¶ 143.  And the conspiracy is not alleged to have begun until the January 17, 2017, meeting, a month and a half after Ms. Liriano's statement.  *Id.* ¶ 95.  The Court therefore cannot impute Ms. Liriano's racially discriminatory statement to the conspiracy or to any of the named defendants.  *See Naumovski*, 934 F.3d at 222 ("[T]he District Court then imputed the allegedly sex-discriminatory conduct of student-athletes to the [d]efendants. Even if this might be permissible in the Title VII context, it is legal error with respect to § 1983 claims."); *Raspardo v. Carlone*, 770 F.3d 97, 127 (2d Cir. 2014) ("Russell appears to claim only that Carlone engaged in disparate treatment by assisting Officer Sloate in writing and editing his statement. . . .  [T]here is no allegation or evidence that Carlone . . . acted disparately toward Russell. Therefore, Russell has not established that Carlone treated her disparately on the basis of sex in this instance."); *Dilworth v. Goldberg*, 914 F. Supp. 2d 433, 468 (S.D.N.Y. 2012) ("Plaintiffs argue that racial animus may be imputed to Wyatt's actions because Wyatt carried out certain orders of Rogers . . . .  But the complaint is devoid of any non-conclusory allegations shedding light on Wyatt's purpose in carrying out Rogers's orders.  That Wyatt carried out Rogers's orders, without more, says nothing about Wyatt's own motive for acting upon the orders.").  Thus, because Plaintiff has failed to allege race-based discriminatory intent on the part of the conspiracy or the named defendants, Plaintiff has failed to adequately plead an equal protection violation by Defendants.

**B.  Plaintiff Has Failed to Adequately Plead a Section 1985 Claim**

Because Plaintiff has failed to plead a constitutional violation or a race-based discriminatory motive, Plaintiff has failed to adequately plead a section 1985 claim.  To state a claim under section 1985, a plaintiff must allege "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person

is either injured in his person or property or deprived of any right or privilege of a citizen of the

United States." *United Bhd. of Carpenters & Joiners, Local 610 v. Scott*, 463 U.S. 825, 828–829 (1983).

"Furthermore, the conspiracy must also be motivated by 'some racial or perhaps otherwise class-

based, invidious discriminatory animus behind the conspirators' action.'" *Mian v. Donaldson, Lufkin*

*& Jenrette Securities Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993) (quoting *Scott*, 463 U.S. at 829).  Section

1985 "provides no substantial rights itself. . . .  The rights, privileges, and immunities that § 1985

vindicates must be found elsewhere." *Scott*, 463 U.S. at 831.  As discussed above, Plaintiff has failed

to adequately plead a violation of her First or Fourteenth Amendment rights.  Further, for the same

reasons discussed above, Plaintiff fails to adequately plead racial animus motivating Defendants'

conduct. *See Mian*, 7 F.3d at 1088 (dismissing a section 1985 claim because the plaintiff's "complaint

fails to offer more than conclusory allegations that he was discriminated against because of his

race"); *Masri v. Thorsen*, No. 17-cv-4094 (KMK), 2020 WL 1489799, at *8 (S.D.N.Y. Mar. 27, 2020)

(dismissing a § 1985 claim where "allegations related to discriminatory animus are conclusory," e.g.,

stating "that Defendants acted 'with vehement animus over [Plaintiff's] ultra-orthodox religious

beliefs and practices'").

## V.    CONCLUSION

For the foregoing reasons, the SAC is dismissed.  Plaintiff has failed to plead a violation of

her free speech, due process, or equal protection rights.  The Court will hold a teleconference on

March 11, 2025 at 4:00 p.m. regarding the issue of whether Plaintiff should be given leave to file a

third amended complaint.  The parties are directed to the Court's Individual Rules of Practice in

Civil Cases, which are available on the Court's website.  Rule 2 of the Court's Individual Rules

contains the dial-in number for the conference and other relevant instructions.  The parties are

specifically directed to comply with Rule 2(C) of the Court's Individual Rules.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 124.

SO ORDERED.

Dated: February 27, 2025
       New York, New York

_____
GREGORY H. WOODS
United States District Judge