UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------- X
                                             :

PATRICIA CATANIA,                      :
                                             :

                            Plaintiff,    :           1:21-cv-1257-GHW
                                             :

                    -v-                :        **MEMORANDUM OPINION &**
                                           :             **ORDER**

UNITED FEDERATION OF TEACHERS, *et al.*,  :
                                           :

                        Defendants.   :
                                           :
----------------------------------------------------------------- X

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: 7/14/2025 |

GREGORY H. WOODS, United States District Judge:

## I.    INTRODUCTION

Plaintiff Patricia Catania was the principal of Middle School 224, a public school in New York City. Ms. Catania is white. She alleges that the defendants—a labor union and a number of its officers—conspired with a group of the school's teachers to get Ms. Catania fired and replaced with a Black principal. To implement this conspiracy, the defendants created what Ms. Catania claims to be the false narrative that Ms. Catania wanted to prevent teachers at the school from teaching Black history. The conspirators publicized that narrative, led protests against Ms. Catania, and lodged false complaints against her with the Department of Education. This conduct provoked a wave of negative publicity and harassment. Ms. Catania ultimately believed she faced a choice between resigning or facing disciplinary action for allegedly pretextual violations, so she resigned from her position.

Ms. Catania commenced this action against the labor union and its representatives under 42 U.S.C. §§ 1983, 1985 for conspiring with public school teachers to constructively discharge her in violation of her rights under the First and Fourteenth Amendments. The Court already dismissed Plaintiff's Free Speech and her Due Process claims with prejudice. After the Court granted Plaintiff leave to replead her Equal Protection claim, Plaintiff filed a Third Amended Complaint. Because

Plaintiff alleges facts sufficient to raise a minimal inference that Woodruff and the UFT—but not Egan, Hinds, or Williams individually—had discriminatory intent, Defendants' motion to dismiss Plaintiff's only remaining claim, her Equal Protection claim, is GRANTED IN PART and DENIED IN PART.

## II.    BACKGROUND

### A.  Plaintiff's Allegations

#### 1.  Parties

On or about December 7, 2016, Plaintiff Patricia Catania began her work at Middle School 224 ("MS 224"), a New York City public school, as the school's acting principal.  Dkt. No. 149 (the Third Amended Complaint or the "TAC") ¶ 75.[1]  She was promoted to become the school's principal in October 2017.  *Id.* ¶ 76.  She served in that role until her resignation on or about June 5, 2019.  *Id.* ¶ 299.  Defendants are the United Federation of Teachers (the "UFT") and four of its representatives, William Woodruff, Paul Egan, Janella Hinds, and Abdul Aqeel Williams.  *Id.* ¶¶ 1, 38.  UFT is a labor union that represents New York City public school teachers.  *Id.* ¶ 23.

Mercedes Liriano, Jacinth Scott, Jasmine Dickson, Diane Roberts, and Chantale Joseph (the "MS 224 Teachers") all taught at MS 224 during Ms. Catania's tenure.  *Id.* ¶ 26.  Although Plaintiff claims that the MS 224 Teachers conspired with Defendants and acted under color of state law to violate her rights, the teachers are not parties to this action.  That is because in June 2019, Ms. Catania reached a state court settlement that released her claims against the Department of Education (the "DOE") and its employees, including the MS 224 Teachers.  *See* 1:19-cv-11245, Dkt. No. 99-2.

---

[1] All facts alleged in the TAC are accepted as true for the purposes of this Rule 12(b)(6) motion.  *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), of which the TAC contains many.

### 2. Union Employees Hold Meetings at MS 224

On January 17, 2017, Mr. Woodruff held a union meeting at MS 224. *Id.* ¶ 93. Mr. Woodruff is a district representative of the UFT who "frequently boasted and bragged that he was capable of taking out administrators." *Id.* ¶ 326. Dozens of MS 224 employees attended the meeting, including the MS 224 Teachers. *Id.* ¶ 94. During the meeting, Mr. Woodruff said, "We can Malcolm X her, by any means necessary we will get her out. Change through violence." *Id.* ¶ 97. He instructed the employees that if they filed union grievances against Ms. Catania, they "can get her out." *Id.*

Plaintiff also alleges that during the January 17, 2017 meeting, "Liriano, Jacinth Scott and/or Jasmine Dickson made statements thereat which could reasonably be understood or interpreted to mean that they wished to remove Catania from the school, or have her removed from the school, if not the DOE altogether, for no other reason than that Catania was White/Caucasian." *Id.* ¶ 95. Plaintiff further alleges that "Woodruff heard these statements, and understood them to mean that the Municipal Officials wanted to remove Catania, or have her removed, from the school, if not the DOE, on account of her race/ethnicity." *Id.* ¶ 96.

The following year, on February 15, 2018, Mr. Woodruff held another union meeting. *Id.* ¶ 106. Many of the same employees attended. *Id.* ¶ 107. Mr. Woodruff instructed them to "grieve even the tiniest thing" to get Catania removed from her position. *Id.* ¶ 108. At a union meeting held a week later, on February 22, 2018, he directed the employees to tell reporters the "false narrative" that Ms. Catania would not allow MS 224 teachers to teach Black history. *Id.* ¶ 137. At this third meeting, Mr. Williams said, "After meeting with Principal Catania she will not want to meet with me again, after I gave her a one-two punch in the face." *Id.* ¶ 130.

Ms. Liriano would "frequently" tell colleagues that "with respect to her priorities, [her] allegiance [was] to the UFT first and foremost, and that she put[] the interests of the UFT before

that of the schoolchildren at MS 224." *Id.* ¶ 63.

### 3. Teachers Complain to the Department of Education and Circulate a Petition to Fire Ms. Catania

Throughout Ms. Catania's tenure at MS 224, teachers lodged complaints about her through a variety of channels. Shortly after Ms. Catania became acting principal, teachers began to file complaints with DOE's Office of Equal Opportunity. *Id.* ¶ 262. The complaints accused Ms. Catania of discriminating against teachers on the basis of race and disability. *Id.* ¶ 272. According to Plaintiff, all of the DOE complaints were "false and unsubstantiated" and were ultimately "formally and expressly determined to be unfounded." *Id.* ¶¶ 262, 264.

"[I]n lockstep with Woodruff's exhortation," teachers also continuously filed grievances against Ms. Catania with the UFT. *Id.* ¶ 268. According to Plaintiff, "none of [those grievances] had merit [and] none of [them] were substantiated." *Id.*

In March 2018, Ms. Liriano circulated a petition to all MS 224 teachers. *Id.* ¶ 238. The stated purpose of the petition was to "[g]et Catania the racist Principal removed." *Id.* That fall, Ms. Roberts sent a letter to DOE Superintendent Rafael Alvarez "falsely accusing Plaintiff therein of racist and discriminatory behavior towards her and some of the teachers at MS 224." *Id.* ¶ 269. Some teachers also called 311, a telephone reporting number established by the City of New York, "to report alleged crimes by Catania and to accuse her of being a racist." *Id.* ¶ 265.

### 4. Teachers Make Disparaging Comments About Ms. Catania at School

Following the union meetings, several MS 224 Teachers made disparaging statements about Ms. Catania to their students. Throughout one school day in February 2018, Ms. Dickson told her students in multiple classes that "Catania is a racist and I don't like what she did - telling Ms. Liriano not to teach [B]lack history month," and "[s]ome of the kids are saying that she said [B]lack people are crazy." *Id.* ¶ 260. That same month, Ms. Liriano told a group of students and a teacher in the school hallway that "Catania is a racist." *Id.* ¶¶ 236–37. Shortly thereafter, Ms. Scott told a group of

students and other teachers that Ms. Catania was a racist and that Ms. Catania "kicked [her] out of [her] room." *Id.* ¶ 259.  Some students also insulted Ms. Catania.  During an "official observation" conducted by a DOE deputy superintendent, a student called Ms. Catania a "racist, white b\*\*ch." *Id.* ¶ 291.  The comments continued into the following year.  In April 2019, Ms. Liriano "caused forty (40) students at the school to opt out of a certain exam . . . so that it would reflect badly on Catania." *Id.* ¶ 292.

Ms. Liriano also denigrated Ms. Catania to her colleagues.  In December 2016, shortly after Ms. Catania became acting principal, Ms. Liriano said, in the presence of the DOE District Superintendent Elisa Alvarez, "[d]on't worry, I'll get a [B]lack principal in here." *Id.* ¶¶ 162–63.  In March 2018, Ms. Liriano told a coworker in the school's main office that Ms. Catania "could be a member of the KKK" and that Ms. Catania's husband "could be a member of the Klan." *Id.* ¶ 241.  Several months later, Ms. Liriano sent an "email and/or text message" to school staff that read as follows:  "[t]oday was MS 224 graduation and yet again Principal Catania was up to her racist antics.  Catania's continual bias rhetoric has had a profound impact on so many.  Yet she continues to be a horrible leader at MS 224." *Id.* ¶ 243.

### 5.  Teachers Speak to the Media

Days before the second union meeting, on February 9, 2018, the UFT arranged a press conference about Ms. Catania. *Id.* ¶ 165.  School parents, school employees, and multiple media organizations attended. *Id.* ¶ 164.  At the press conference, Ms. Liriano made several "false statements" about Ms. Catania to reporters. *Id.* ¶ 167.  She said that Ms. Catania was racist, that Ms. Catania did not allow teachers to teach Black history, and that Ms. Catania had said "that [B]lack teachers have poor knowledge of their subjects and are only good at controlling classrooms." *Id.* Ms. Scott also spoke at the conference.  She called Ms. Catania a racist and asserted that Ms. Catania "doesn't belong in the school." *Id.* ¶ 245.  Days later, the New York Daily News published a front-

page article about Ms. Catania, entitled "READING, WRITING & RACISM." *Id.* ¶¶ 170–71. The article featured quotes from Ms. Liriano and Ms. Scott accusing Ms. Catania of racism. *Id.* ¶¶ 170, 251. Mr. Woodruff allegedly "knew beforehand what would be reported . . . and/or [he] controlled or directed or caused what would be reported to the news reporters." *Id.* ¶ 184.

In the following weeks, Ms. Liriano made more statements to the media in front of the school. *Id.* ¶¶ 209–30. Those statements were aired on television, posted online, and quoted in news articles. *Id.* Ms. Liriano accused Ms. Catania of instructing Ms. Liriano not to teach her students Black history. *Id.* ¶ 210. She also said that Ms. Catania had confiscated students' work on Black history and had hidden it in her office, that she had harassed students and teachers, and that she had made disparaging comments about Black people and their effectiveness as teachers. *Id.* ¶¶ 215, 222, 228.

### 6. The UFT Holds Protests Outside of the School

In the week after the press conference, Mr. Woodruff organized two protests outside of the school. *Id.* ¶ 114. The protests featured "public speeches to the crowd and public comments to the media, which speeches and comments all cast Catania in a false and negative light, including the false and negative light of being a racist." *Id.* Other "participants in and organizers of" the protests included Ms. Liriano, other teachers from the school, students, parents, community members, and local news reporters. *Id.* ¶¶ 115, 117.

Mr. Woodruff contacted members of the media to cover the protests. *Id.* ¶ 119. The subsequent media coverage "amplified and parroted the false narrative that Catania was a racist." *Id.* ¶¶ 120–121, 124. At one protest, Defendants and Ms. Liriano organized a photograph featuring Ms. Liriano and four MS 224 students. *Id.* ¶ 177. In the photograph, the students held signs bearing slogans associated with the Black Lives Matter movement and expressing the importance of teaching Black history. *Id.* ¶¶ 177–80. The photo appeared in the front-page article in the New York Daily

News about Ms. Catania.  *Id.* ¶ 177.

Protesters shouted death threats and insults at Ms. Catania, including "white racist b\*\*ch" and "white devil."  *Id.* ¶ 125.  Plaintiff alleges that "during either or both of these rallies/protests, Woodruff was observed exhorting the protestors to say the things they said and/or do the things they did, as alleged herein, and/or he was observed saying and/or doing those very things himself." *Id.* ¶ 126.  Ms. Catania "needed to be escorted to and from work for at least four (4) weeks" following the first protest.  *Id.* ¶ 129.  During the second organized protest, a news reporter "urged the protesters and students to physically and dangerously pursue Catania in a threatening manner for the benefit of the news cameras."  *Id.* ¶ 123.  Police officers and DOE security officers restrained the protestors and closed the street so that Ms. Catania could safely reach her car.  *Id.* ¶¶ 123, 128.

### 7.  Union Employees Demonstrate Outside of Ms. Catania's Office

On two occasions in June 2018, groups of UFT employees, including Defendants, gathered outside of Ms. Catania's office "in a loud, disruptive, and threatening manner."  *Id.* ¶¶ 139, 146.  At the first demonstration, Mr. Egan stated, "We are here to intimidate her [meaning Catania] like she is intimidating our members."  *Id.* ¶ 139.  He also said to Ms. Catania, "I can make or break your career.  I know you're not racist, but with newspapers it's all about perception and it's all about the spin I put on it."  *Id.*

### 8.  Ms. Catania Resigns

In December 2018, Superintendent Rafael Alvarez "questioned [Catania] as to whether she could continue to lead, or effectively lead, the school" given the protests and negative media attention.  *Id.* ¶ 294.  In the spring of the following year, around the time Ms. Liriano had students opt out of the exam in protest, Superintendent Alvarez told Ms. Catania's union representative that "as result of the controversy caused by the Daily News articles, and the protests [] at the school, and the media coverage with respect thereto, Catania was 'radioactive' and was thus going to be removed

as Principal." *Id.* ¶ 294. According to the SAC, Superintendent Alvarez began adding to Ms. Catania's personnel file "trivial, technical and/or outright false violations" as a "pretext[]" to remove her from her position. *Id.* ¶ 296. However, Plaintiff claims that "[t]he actual reason the DOE intended to remove Catania as school Principal was not based on the pre-textual violations, but because that they had no choice but to remove her based on the false and dangerous narrative" Defendants and the MS 224 Teachers had promulgated about Ms. Catania. *Id.* ¶ 297. Plaintiff alleges that her "performance as a DOE employee was exemplary" and that "she had an unblemished work history . . . and a stellar reputation." *Id.* ¶ 309.

On or about June 5, 2019, Ms. Catania resigned from her job as principal of MS 224. *Id.* ¶ 299. Ms. Catania believed that if she did not resign, she would face discipline, including possible removal as principal and reassignment as an assistant principal in the same district, based on the allegedly pretextual violations that Superintendent Alvarez had added to her personnel file. *Id.* ¶ 298. She also resigned to escape Defendants' "wrongful campaign of terror and harassment against her in conspiracy with others." *Id.* Ms. Catania was replaced by a principal of color, and since Ms. Catania's departure, MS 224 has not had another white principal. *Id.* ¶ 72.

### B. Procedural History

The Court refers to the opinion and order dated February 27, 2025, dismissing Plaintiff's Second Amended Complaint, for the relevant procedural history. Dkt. No. 129 ("Prior MTD Opinion") at 8–9. After the Court issued the Prior MTD Opinion, Plaintiff filed a motion for reconsideration on March 13, 2025, Dkt. No. 132, which the Court denied in an opinion dated April 15, 2025, Dkt. No. 136 ("Recon. Opinion"). The Court held a conference on April 15, 2025 to discuss whether Plaintiff should be granted leave to file a third amended complaint. In an order dated April 22, 2025, the Court granted Plaintiff leave to amend her complaint "solely to cure the deficiencies identified with respect to her Equal Protection claim." Dkt. No. 139 ("LTA Order") at

7. The Court held that further amendment of Plaintiff's other claims would be futile and therefore dismissed her other claims with prejudice. *See generally id.*

On May 16, 2025, Plaintiff filed the Third Amended Complaint. On May 30, 2025, Defendants filed a motion to dismiss the TAC, Dkt. No. 150, and an accompanying memorandum of law, Dkt. No. 151 ("Def. MOL"). Plaintiff filed opposition on June 13, 2025. Dkt. No. 152 ("Pl. Opp."). Defendants filed a reply on June 20, 2025. Dkt. No. 153 ("Def. Reply").

## III.    LEGAL STANDARD

Under Fed. R. Civ. P. 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 110–11 (2d Cir. 2010). To avoid dismissal, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A formulaic recitation of the elements of a cause of action, devoid of supporting facts, does not suffice. *Id.* To satisfy the "plausibility" requirement, the plaintiff must plead facts that permit the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). However,

> "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." A complaint must therefore contain more than "naked assertion[s] devoid of further factual enhancement." Pleadings that contain "no more than conclusions . . . are not entitled to the assumption of truth" otherwise applicable to complaints in the context of motions to dismiss.

*DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87–88 (2d Cir. 2013) (alterations in original) (quoting *Iqbal*, 556 U.S. at 678–79). Thus, a complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555, 557).

On a motion to dismiss, a court must generally "limit itself to the facts stated in the complaint." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006) (quoting *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999)). A court may also consider "documents attached to the complaint as exhibits, . . . documents incorporated by reference in the complaint . . . [and] document[s] integral to the complaint." *DiFolco*, 622 F.3d at 111 (internal quotation marks and citation omitted). In the Rule 12(b)(6) context, "[a] court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). "The purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006). "The Rule thus assesses the legal feasibility of the complaint but does not weigh the evidence that might be offered to support it." *Id.*

## IV.    DISCUSSION

### A.  Plaintiff's Stigma Plus Claim Has Already Been Dismissed with Prejudice

Plaintiff's Opposition misrepresents the Court's previous orders when it states that "the Court[] [held] that Plaintiff has already adequately pleaded a stigma-plus claim." Opposition at 6; *see also id.* at 8. That is simply incorrect. In the Prior MTD Opinion, the Court held that Plaintiff's Due Process claims under the Fourteenth Amendment were not adequately pleaded and were therefore dismissed. *See* Prior MTD Opinion at 15, 29. Specifically with respect to the stigma-plus claim, the Court held that while Plaintiff adequately pleaded a stigma-plus injury, she was not deprived of due

process. *Id.* at 20–25. Therefore, Plaintiff's stigma-plus claim was dismissed. *See id.* at 23–25. The Court reiterated its holding in the reconsideration opinion. Recon. Opinion at 4–5 & n.4. And again, in the LTA Order, the Court held that "further amendment would not cure the deficiencies" in Plaintiff's "stigma-plus claim." LTA Order at 6. Therefore, the stigma-plus claim was dismissed with prejudice. *Id.* at 8 ("The effect of this order, in conjunction with the Court's February 27, 2025 order, is that Plaintiff's other claims—those that do not rely on a violation of the Equal Protection Clause—are dismissed with prejudice.").

Federal Rule of Civil Procedure 11 provides:

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law . . . .

Fed. R. Civ. P. 11(b)(2). Counsel for Plaintiff is reminded of his obligations as a member of the bar of the State of New York and as a practitioner in federal court not to misrepresent this Court's orders.

### B. Plaintiff Adequately Pleads a § 1983 Claim Against Woodruff and the UFT Based on a Violation of Plaintiff's Equal Protection Rights

Plaintiff's Third Amended Complaint adequately states a claim that Woodruff and the UFT violated her Equal Protection rights under color of state law. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

The Fourteenth Amendment's Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "The Equal Protection Clause 'is essentially a direction that all persons similarly

situated should be treated alike.'" *Brown v. City of Oneonta, New York*, 221 F.3d 329, 337 (2d Cir. 2000) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)). "Consequently, public employees aggrieved by discrimination in the terms of their employment may bring suit under 42 U.S.C. § 1983 against any responsible persons acting under color of state law." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015).

To constitute action under color of state law, "the deprivation must be caused by the exercise of some right or privilege created by the State," and "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Atkins*, 487 U.S. at 49 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)).

Because Defendants are nominally private parties, Plaintiff must adequately plead that their actions are properly attributed to the state.[2]

> For the purposes of section 1983, the actions of a nominally private entity are attributable to the state . . . (1) [when] the entity acts pursuant to the coercive power of the state or is controlled by the state ("the compulsion test"); (2) when the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies ("the joint action test" or "close nexus test"); or (3) when the entity has been delegated a public function by the state ("the public function test").

*Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012) (quoting *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008)). A plaintiff may adequately plead "joint action" by pleading the existence of a section 1983 conspiracy. To plead the existence of a section 1983 conspiracy, a plaintiff must allege "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002) ("To state a claim against a private entity on a section 1983 conspiracy theory, the complaint must allege facts

---

[2] Defendants argue, and Plaintiff does not dispute, that union representatives generally are not state actors subject to section 1983 liability. *See, e.g.*, *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002) ("Labor unions . . . generally are not state actors." (citation omitted)).

12

demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act.  Put differently, a private actor acts under color of state law when the private actor is a willful participant in joint activity with the State or its agents." (internal citations and quotations omitted)).

### 1. Plaintiff Plausibly Alleges that Woodruff and the UFT Discriminated Against Her on the Basis of Her Race

Plaintiff plausibly alleges that Woodruff and the UFT discriminated against her on the basis of her race.  "To state a discrimination claim under the Fourteenth Amendment Equal Protection Clause . . . plaintiffs must sufficiently allege that defendants acted with discriminatory intent." *Burgis v. New York City Dept. of Sanitation*, 798 F.3d 63, 68 (2d Cir. 2015).  "[A] plaintiff pursuing a claim for employment discrimination under § 1983 . . . must establish that the defendant's discriminatory intent was a 'but-for' cause of the adverse employment action or the hostile environment." *Naumovski v. Norris*, 934 F.3d 200, 214 (2d Cir. 2019).  "Naked" and "conclusory" allegations of discriminatory intent are insufficient, *Albert v. Carovano*, 851 F.2d 561, 572 (2d Cir. 1988); "the plaintiff must thus 'present facts sufficient to support an inference of intentional discrimination,'" *Islam v. Melisa*, No. 18-cv-2535 (KAM) (LB), 2020 WL 1452463, at *12 (E.D.N.Y. Mar. 24, 2020) (quoting *Howard v. City of New York*, 602 F. App'x 545, 557 (2d Cir. 2015)).  *See also Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002) ("[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct.").

The Second Circuit has "cautioned courts to be mindful of the elusive nature of intentional discrimination when making a plausibility determination at the motion-to-dismiss phase because discrimination claims implicate an employer's usually unstated intent and state of mind and therefore rarely is there direct, smoking-gun, evidence of discrimination." *Buon v. Spindler*, 65 F.4th 64, 83 (2d

Cir. 2023) (internal quotation marks omitted).  "Thus, with respect to the issue of intent, 'the facts required by *Iqbal* to be alleged in the complaint need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination,' but rather 'need only give plausible support to a *minimal* inference of discriminatory motivation.'"  *Id.* (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015)) (emphasis added).

The Third Amended Complaint alleges facts sufficient to plausibly plead a minimal inference of Woodruff's discriminatory motivation:  that he targeted Plaintiff and attempted to remove her from her position because she is white.  The Court refers to the Prior MTD Opinion at 26–28 for analysis of why Plaintiff's previous allegations relating to discriminatory intent either are conclusory or cannot be imputed to Defendants and the alleged conspiracy.[3]  Plaintiff's new allegations regarding discriminatory intent are (1) that the allegedly false narrative about Plaintiff "hinged on the fact that [she] is White," TAC ¶ 89; (2) that during the January 17, 2017 meeting, Woodruff heard statements made by some of the MS 224 Teachers that "could reasonably be understood or interpreted to mean that" they wished to remove her from the school because she is white, *id.* ¶¶ 95–96; (3) that during "either or both" of the protest rallies, "Woodruff was observed exhorting the protestors to say the things they said and/or do the things they did, as alleged herein, and/or he was observed saying and/or doing those very things himself," *id.* ¶ 126; (4) that Plaintiff was replaced by a principal of color, *id.* ¶ 72; and (5) allegations regarding Woodruff's statement that he wanted to "Malcolm X" Plaintiff, *id.* ¶¶ 98–101.[4]  Plaintiff's new allegations regarding Woodruff's conduct during the protest rallies and regarding his Malcolm X comment plausibly support a

---

[3] Despite counsel for Plaintiff's arguments that the prior allegations were sufficient to get Plaintiff to discovery, "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 556 U.S. at 678–79.

[4] Plaintiff also adds the allegation that, with respect to the grievances Woodruff encouraged teachers to file, "[i]nasmuch as some of those grievances had a racial element or component this was part of the overall conspiracy."  TAC ¶ 105. This statement plainly is not an allegation that any of the grievances did in fact have a racial element or component.  It is for Plaintiff to allege the extent to which the grievances were racially charged, not for the Court to presume.

minimal inference of his discriminatory intent.

### a. Allegations Regarding the Narrative Pushed by Defendants that Plaintiff Is Racist

The fact that Defendants accused Plaintiff of racism does not itself raise an inference of discrimination on the basis of her race.  The Second Circuit has clearly held that "a statement that someone is a 'racist,' while potentially indicating unfair dislike, does not indicate that the object of the statement is being rejected *because of his race*." *Maraschiello v. City of Buffalo Police Dept.*, 709 F.3d 87, 97 (2d Cir. 2013) (emphasis in original).  "'Racism' is not a race, and discrimination on the basis of alleged racism is not the same as discrimination on the basis of race." *Id.*  Therefore, Defendants' "repeated condemnations of racism [] did not 'implicate Plaintiff's race.'" *Cooper v. Templeton*, 629 F. Supp. 3d 223, 230 (S.D.N.Y. 2022), *aff'd sub nom. Cooper v. Franklin Templeton Investments*, No. 22-2763-cv, 2023 WL 3882977 (2d Cir. June 8, 2023) (brackets omitted); *see also Maron v. Leg. Aid Socy.*, 605 F. Supp. 3d 547, 560 (S.D.N.Y. 2022) ("To be clear, the Court's finding that Plaintiff has plausibly alleged that Defendants' criticism of Plaintiff was racially motivated is based on more than the mere fact that Plaintiff is white and was accused of being racist.  Indeed, as a matter of both logic and precedent, accusations of racism against a white person are not *ipso facto* indicia of race-based discrimination.").

While Plaintiff argues that her race made Defendants' campaign more successful, that fact is irrelevant to the Court's analysis of Defendants' intent in organizing the campaign to expel her in the first place.  *See Cooper*, 629 F. Supp. 3d at 230 (holding that an inference of "discriminatory animus" could not be drawn from Defendants' "communications to the public [] repeatedly connecting their stated stance against racism with their termination of Plaintiff" (alterations omitted)); *contra* Pl. Opp. at 8 ("[A]ccusing a person of color of discriminating against another person of color has virtually no impact, as evinced by the very fact that news articles annexed as exhibits to the TAC all focus almost exclusively on the fact that Catania is White . . . .").

### b. Allegations Regarding the Statements Made at the January 17, 2017 Union Meeting

Plaintiff's allegations about what was said at the January 17, 2017 union meeting are little more than threadbare recitals and "legal conclusion[s] couched as a factual allegation." *Spindler*, 65 F.4th at 76 (quoting *Twombly*, 550 U.S. at 555). Plaintiff alleges that Woodruff heard "Liriano, Jacinth Scott and/or Jasmine Dickson ma[k]e statements [] which could reasonably be understood or interpreted to mean that they wished to remove Catania from the school, or have her removed from the school, if not the DOE altogether, for no other reason than that Catania was White/Caucasian." TAC ¶¶ 95–96. First, this allegation is little more than a "[t]hreadbare recital[] of the element[] of [the] cause of action." *Iqbal*, 556 U.S. at 678. After Plaintiff has been told than an element of her Equal Protection claim is but-for discriminatory intent, Plaintiff simply alleges that unspecified statements existed that "could reasonably be . . . interpreted to mean" that Defendants wished to remove Plaintiff on the basis of her race. That allegation is a half-step more factually specific than simply alleging, "facts exist that would plausibly plead that Defendants had discriminatory intent." Second, this allegation is a legal conclusion. It is for the Court to determine the sufficiency of the factual allegations and the reasonable inferences to be drawn from them. *See Iqbal*, 556 U.S. at 674–75. Plaintiff must allege *facts*—for example, statements or events—from which the Court can "reasonably interpret" an inference of Defendants' discriminatory intent. Plaintiff's assertion of what the unspecified statements "could reasonably be . . . interpreted to mean," TAC ¶ 95, is a "legal conclusion couched as a factual allegation." *Spindler*, 65 F.4th at 76 (quoting *Twombly*, 550 U.S. at 555).

Plaintiff, in requesting an opportunity to amend the complaint, asserted that she would "have a specific section where every racially motivated statement is pleaded," and "provide, to the best [she] can, the speaker/writer of the statement, the time and place of the statement, the connection of the statement to the cause of action, and the connection of the statement to the

specific UFT defendants and to the overall conspiracy and/or the defendants acting in concert with the state actors." Dkt. No. 137 at 3. Despite proffering such amendments, all Plaintiff has come up with is a vague and conclusory allegation that unspecified statements were made that, according to Plaintiff, could be understood to evince discriminatory intent. Almost four and a half years into this case, with multiple opportunities to amend her pleadings, Plaintiff still fails to allege a single statement from the January 17, 2017 meeting—beyond the Malcolm X comment—that supports an inference that the union defendants wished to remove Plaintiff because she is white. Drawing on "judicial experience and common sense," the Court is not convinced that the allegations at TAC ¶¶ 95–96 constitute "sufficient factual matter"—as opposed to "naked assertions devoid of further factual enhancement"—to "nudge[] [Plaintiff's] claims of invidious discrimination across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 678–80 (cleaned up).

### c. Allegation Regarding Woodruff's Conduct During the Protest Rallies

While Plaintiff's new allegation regarding Woodruff's "exhortation" to the protestors is rather vague, the allegation does raise an inference of Woodruff's discriminatory intent. Plaintiff previously alleged that unnamed protestors at the rallies shouted race-based profanity at her. TAC ¶ 125. Plaintiff now also alleges that "Woodruff was observed exhorting the protestors to say the things they said and/or do the things they did, as alleged herein, and/or he was observed saying and/or doing those very things himself." *Id.* ¶ 126.

While the allegation does not clearly state which of "the things said" and "the things done" Woodruff encouraged, the Court accepts Plaintiff's counsel's proffer, subject to Fed. R. Civ. P. 11, that the allegation, also subject to Rule 11, is that Woodruff "exhorted the protestors to say the[] specific racist comments." Pl. Opp. at 10. The Third Amended Complaint notably does not explicitly allege that Woodruff exhorted the protestors to yell slurs and race-based profanities at Plaintiff; nor does Plaintiff explicitly allege that Woodruff himself yelled the slurs and race-based

profanities at Plaintiff.  Plaintiff was made aware by the Prior MTD Opinion and at the April 15, 2025 conference that the protestors' racist statements and actions, if imputed to Defendants, would be relevant to the Court's intent analysis.  Therefore, if Plaintiff has information or belief based on evidence or likely evidentiary support that Woodruff exhorted those specific statements and actions—or indeed did them himself—then presumably Plaintiff would allege that.[5]  Plaintiff's allegation is much less clear:  it could be read to suggest either that Woodruff "exhorted" all of the protestors' conduct or just some unspecified conduct.  Nevertheless, the Court need not speculate what Plaintiff intended to allege, given Plaintiff's counsel's clarification at Pl. Opp. at 10.

Plaintiff's allegation that Woodruff encouraged protestors to shout "white racist b**ch" and "white devil," among other things, *see* TAC ¶ 125, supports an inference of Woodruff's discriminatory intent.  *See Hicks v. IBM*, 44 F. Supp. 2d 593, 598 (S.D.N.Y. 1999) (holding that "racially motivated comments . . . give rise to an inference of discriminatory intent"); *Bishop v. Toys "R" Us-NY LLC*, 414 F. Supp. 2d 385, 391 (S.D.N.Y. 2006), *aff'd sub nom. Bishop v. Toys R Us*, 385 F. App'x 38 (2d Cir. 2010) (unpublished) (holding that allegations of being "subjected to racial epithets" and disparate treatment is sufficient at the pleading stage).

### d.  Allegation that Plaintiff Was Replaced by a Non-White Principal

The Court does not find Plaintiff's new allegation that Plaintiff was ultimately replaced by a non-white principal to be strong support for an inference of discrimination on the part of Defendants' and the alleged conspiracy.  While the Second Circuit has held that "an inference of discrimination [] arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class," *Littlejohn v. City of New York*, 795 F.3d 297, 312–

---

[5] In fact, during the April 15, 2025 conference, counsel for Plaintiff asserted that he had video evidence of Woodruff "stoking [the protestors] up to do this" and that he would add allegations of a "witness willing to say X, Y, and Z [and] a videotape that will show A, B, and C."  Dkt. No. 140 at 23:21–24:9.  Counsel for Plaintiff promised more than he delivered.

13 (2d Cir. 2015), the defendants here are not Plaintiff's employer and are not alleged to have replaced Plaintiff. The defendants in this case are the local teachers' union and representatives of the union, who Plaintiff alleges conspired with the MS 224 Teachers. Plaintiff does not allege that Defendants or the MS 224 Teachers had any control over, or even input into, the decision to hire the next principal. Plaintiff's former employer was the New York City Department of Education, and Plaintiff settled her claims against the city and its employees in 2019. Therefore, the decision to hire a non-white principal to replace Plaintiff has little to no probative value in assessing Defendants' discriminatory intent.

### e. Allegations Regarding Woodruff's "Malcolm X" Comment

A minimal inference of discriminatory intent can be drawn from Woodruff's statement during the January 17, 2017 meeting that he wanted to "Malcolm X" Plaintiff shortly after she started working at MS 224. Given Malcolm X's complex legacy, the Court cannot say as a matter of law that no reasonable inference could be drawn that Woodruff was referencing what Plaintiff calls "notions of Black Supremacy and Black separatism." TAC ¶ 99. And if Woodruff was indeed "indicating that people of color at [MS 224] needed to be separated from Catania because of her White/Caucasian race," then this is sufficient to raise a *minimal* inference that Woodruff's actions were taken on the basis of Plaintiff's race. *Id.* ¶ 103.

### 2. Plaintiff Fails to Plausibly Plead that Egan, Hinds, or Williams Had Discriminatory Intent or Knowingly Furthered Woodruff's Discriminatory Intent

The Third Amended Complaint still fails to plausibly plead that Egan, Hinds, or Williams had or were aware of discriminatory motivation for removing Plaintiff from her position. Plaintiff adds no new allegations regarding Hinds' motivation or intent. Plaintiff does not allege that Egan, Hinds, or Williams were present at the January 17, 2017 meeting or were otherwise made aware of Woodruff's statements made at the meeting. *See* TAC ¶ 94 ("In attendance and present at [the

January 17, 2017] meeting were the following individuals in addition to Woodruff:  approximately twenty-four (24) teachers of MS 224 including Liriano, Jacinth Scott, [and] Jasmine Dickson . . . ; as well as approximately four (4) para-professionals of MS 224 . . . .").  There is no allegation that any of these defendants witnessed Woodruff's conduct at the protests, where he allegedly exhorted protestors to shout race-based profanities at Plaintiff.

Plaintiff's only new allegations relating to these defendants is that Woodruff "conveyed his thoughts and beliefs about Malcolm X" to Egan and Williams, and that Egan and Williams themselves "believed in Malcolm X's philosophy."  TAC ¶¶ 135, 151.  These unsupported allegations that Egan and Williams believed in black separatism are equally as conclusory as alleging that they believed that Plaintiff should be removed on account of her race.  *See Masri v. Thorsen*, No. 17-cv-4094 (KMK), 2020 WL 1489799, at *8 (S.D.N.Y. Mar. 27, 2020) ("[T]he mere assertion of discriminatory motivation is not sufficient to state a claim . . . ." (internal brackets and quotation marks omitted)).[6]  There is no allegation that either Egan or Williams mentioned such beliefs during the relevant period, at the alleged protests, or to the alleged co-conspirators.  The Third Amended Complaint contains no *factual allegations* that link these unsupported assertions of their beliefs, to the extent they are not "pure speculation and conjecture,"[7] with a motivation to remove Plaintiff from her position.  *Brook v. Ruotolo*, No. 23-1339, 2024 WL 3912831, at *3 (2d Cir. Aug. 23, 2024) (unpublished) ("Adam's litany of unsupported assertions about the intent and motivations of the various defendants do not salvage his claims.  We 'have no obligation to entertain pure speculation

---

[6] Shifting a conclusory allegation that the defendant had "discriminatory intent" to an allegation that the defendant "disliked race Y" to an allegation that the defendant "believed X thing about race Y" makes the conclusory allegation more specific but no more plausible or based in alleged facts.

[7] The Court notes that pleading "on information and belief" does not relieve a party of its obligations under Rule 11 that, "after an inquiry reasonable under the circumstances," the party's "factual contentions have evidentiary support or . . . will likely have evidentiary support."  Fed. R. Civ. P. 11.  *See Barrett v. Forest Laboratories, Inc.*, 39 F. Supp. 3d 407, 431 (S.D.N.Y. 2014) ("When a plaintiff sets out allegations on information and belief, he is representing that he has a good-faith reason for believing what he is saying, but acknowledging that his allegations are based on secondhand information that he believes to be true.").

and conjecture.'" (quoting *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011))).  Plaintiff is not helped by the succeeding allegations that Egan and Williams took the actions alleged "in line with Malcolm X's philosophy" and "on account of [Plaintiff's] race."  TAC ¶¶ 136, 152.  Those allegations are also conclusory.  *See Masri*, 2020 WL 1489799, at *8 (holding that it was conclusory to allege that the defendants "propagated false negative publicity against Plaintiff and his ultra-religious beliefs . . . as a direct result of their intensive hate over the practice of his religious beliefs" (cleaned up)).  Plaintiff still fails to allege *facts* to from which discriminatory motivation—whether black separatist, black supremacist, or otherwise—can be inferred.

Nor can the Court infer that Egan and Williams "knowingly further[ed]" Woodruff's alleged discriminatory intent.  *Naumovski*, 934 F.3d at 221 n.84.  The allegations that Woodruff—at some unspecified time and in some unspecified context—"conveyed his thoughts and beliefs about Malcolm X" to Egan and Williams are too vague and general to plausibly plead that they were engaged in an intentionally discriminatory conspiracy with respect to Plaintiff.  Plaintiff does not allege when these beliefs were conveyed or whether they were conveyed in the context of the conspiracy to get Plaintiff removed.  The Court therefore cannot infer that in participating in the protests and actions against Plaintiff, Egan and Williams were intentionally or knowingly engaged in discriminating against Plaintiff on the basis of her race.  *See Wong v. Yoo*, 649 F. Supp. 2d 34, 71 (E.D.N.Y. 2009) (brackets omitted) ("[I]n the § 1985(3) context, 'intentional discrimination must motivate the group of conspirators.'  Where 'only one conspirator was so motivated, the conspiracy does not fall within the scope of § 1985(3).'" (quoting *Straker v. Metro. Transit Auth.*, No. 03-cv-1756, 2005 WL 3287445, at *3 (E.D.N.Y. Dec. 5, 2005))).  "[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed." *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002).

### 3. Plaintiff Adequately Pleads that Woodruff and the UFT Acted Under Color of State Law When They Acted Jointly with the MS 224 Teachers to Violate Plaintiff's Rights

The Third Amended Complaint plausibly alleges that Woodruff acted jointly with the MS 224 Teachers, who themselves were acting under color of state law, and therefore that Woodruff's conduct was state action.

First, Plaintiff plausibly alleges that Woodruff conspired with the MS 224 Teachers to defame Plaintiff and get her removed from her position on account of her race. Plaintiff alleges that Woodruff held meetings with the MS 224 Teachers, during which they agreed to take steps to get plaintiff removed, such as filing grievances. TAC ¶¶ 93–94, 96–97, 106–08, 112. Defendants then took steps jointly with the MS 224 Teachers toward achieving their goal. The MS 224 Teachers filed numerous false and unsubstantiated complaints against Plaintiff with the DOE and with the UFT as directed by Woodruff. TAC ¶¶ 262, 272, 268, 269. Woodruff and the UFT organized press conferences and rallies at which various MS 224 Teachers made false and derogatory statements about Plaintiff, again at Woodruff's direction. *See Young v. Suffolk Cnty.*, 705 F. Supp. 2d 183, 198 (E.D.N.Y. 2010) (finding joint action where the defendant did more than just "summon" state actors but tried to "control and influence" them and "assisted in the execution" of the constitutional violation).

Crucially, the MS 224 Teachers heard Woodruff's comments about wanting to "Malcolm X" Plaintiff, from which a reasonable inference may be drawn that they were "knowingly furthering the discriminatory intent" in carrying out Woodruff's plans. *Naumovski*, 934 F.3d at 221 n.84. At the very least, a plausible inference can be drawn that Liriano, who explicitly stated that she wanted to replace Plaintiff with a black principal, was intentionally engaged in discriminating against Plaintiff on the basis of her race. *See* TAC ¶¶ 162–63. Woodruff and the MS 224 Teachers are therefore alleged to have conspired and acted in concert to violate Plaintiff's constitutional rights.

Second, Plaintiff plausibly alleges that the MS 224 Teachers were acting under color of state law in engaging in the conspiracy. To adequately plead that a person acted under color of state law, a plaintiff must allege that the person "exercised power possessed by virtue of state law and made possible only because [he] is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988) (quotation marks omitted). "[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *Id.* at 50.

Identifying actions taken under color of state law requires more "than a simple determination as to whether [a public employee] was on or off duty when the challenged incident occurred." *Pitchell v. Callan*, 13 F.3d 545, 547–48 (2d Cir. 1994). "[A]cts of [public employees] in the ambit of their personal pursuits are plainly excluded," regardless of duty status. *Id.* at 548 (quoting *Screws v. United States*, 325 U.S. 91, 111 (1945)). By contrast, actions that invoke the "real or apparent power" of the state may constitute state action, even if not performed while on duty. *Id.* "In short, courts look to the nature of the [employee]'s act" and not simply whether he was at work. *Id.*

Educators who are public employees act under color of state law when they "misuse [their] authority" over their students. *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 744 (2d Cir. 2003) (finding that a state university professor acted under color of state law when he harassed his student because "[a] professor at a state university is vested with a great deal of authority over his students with respect to grades and academic advancement by virtue of that position"); *see also Romero v. City of New York*, 839 F. Supp. 2d 588, 625 (E.D.N.Y. 2012) (denying summary judgment where a teacher "used his authority as a teacher to initiate and escalate his relationship with [the student plaintiff]" even though much of the abuse took place after school hours and off school grounds); *compare Wolff v. State Univ. of N.Y. Coll. at Cortland*, No. 113-cv-1397 (BKS) (CFH), 2016 WL 9022503, at *14 (N.D.N.Y. Feb. 5, 2016) (holding that when a teacher did not have any "authority or control over" a

plaintiff who was not the teacher's student, the teacher "did not abuse their position" and was therefore not a state actor), *aff'd sub nom. Wolff v. State Univ. of N.Y.*, 678 F. App'x 4 (2d Cir. 2017) (summary order).

Here, the MS 224 Teachers' alleged conduct was under color of state law.  The MS 224 Teachers were not merely protesting in the ambit of their personal pursuits as private citizens, *see, e.g., Combier v. Portelos*, 788 F. App'x 774, 778 (2d Cir. 2019) (unpublished) ("These allegations, even if true, do not establish that . . . [the defendants'] attempts to defame [the plaintiff] and harm her business were possible only because they were cloaked with DOE authority."); they were using their authority as teachers to harass and defame Plaintiff.  They lodged formal workplace complaints through the DOE, through the UFT, and directly to Superintendent Alvarez, even though the complaints were "false and unsubstantiated."  TAC ¶¶ 262, 265, 268, 269; *see Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York*, 593 F.3d 196, 201 (2d Cir. 2010) ("[B]y filing a grievance with his union to complain about his supervisor's failure to discipline a child in his classroom, [the teacher] was speaking pursuant to his official duties and thus not as a citizen.").  Multiple MS 224 Teachers made derogatory comments about Plaintiff directly to students, over whom they had authority, in classroom settings.  TAC ¶¶ 236–37, 259, 260.  Ms. Liriano even "caused forty students . . . to opt out of a certain exam" in order to "reflect badly" on Plaintiff.  *Id.* ¶ 292.  These formal DOE complaint processes and the influence over students were only available to the MS 224 Teachers by virtue of "the position[s] given to [them] by the State."  *Hayut*, 352 F.3d at 744.  In stoking resentment toward Plaintiff, *see, e.g.*, TAC ¶ 291 ("[D]uring an official observation from a DOE deputy superintendent, inside a classroom in the school, a student called Catania a 'racist, white b**ch' in front of said deputy superintendent."), and in discouraging students from taking exams for reasons unrelated to their educational development, the MS 224 Teachers misused that influence over their students.  Therefore, the MS 224 Teachers' conduct constituted state action for purposes

of Plaintiff's § 1983 claim.

### C. Plaintiff Adequately States a Claim Under § 1985 Against Woodruff and the UFT

Plaintiff adequately states a claim against Woodruff and the UFT under 42 U.S.C. § 1985. To state a claim under section 1985, a plaintiff must allege "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *United Bhd. of Carpenters & Joiners, Local 610 v. Scott*, 463 U.S. 825, 828–829 (1983). "Furthermore, the conspiracy must also be motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.'" *Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993) (quoting *Scott*, 463 U.S. at 829). Section 1985 "provides no substantial rights itself. . . . The rights, privileges, and immunities that § 1985 vindicates must be found elsewhere." *Scott*, 463 U.S. at 831. "A conspiracy, for these purposes, need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct." *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 427 (2d Cir. 1995) (internal quotation marks omitted).

For the same reasons discussed above, Plaintiff's allegations satisfy the elements of a § 1985 claim with respect to the UFT and Woodruff: Plaintiff plausibly pleads a successful conspiracy between Woodruff and the MS 224 Teachers to remove Plaintiff from her position on the basis of her race, in violation of her Equal Protection rights. For the same reasons discussed above, Plaintiff has still failed to allege that Egan, Hinds, or Williams had the necessary discriminatory intent to state a § 1985 claim against them. *See Wong v. Yoo*, 649 F. Supp. 2d 34, 71 (E.D.N.Y. 2009) (brackets omitted) ("[I]n the § 1985(3) context, 'intentional discrimination must motivate the group of conspirators.' Where 'only one conspirator was so motivated, the conspiracy does not fall within the

scope of § 1985(3).'" (quoting *Straker v. Metro. Transit Auth.*, No. 03-cv-1756, 2005 WL 3287445, at *3 (E.D.N.Y. Dec. 5, 2005))).

## V.    LEAVE TO AMEND

Plaintiff requests that, should Defendants' motion not be denied in its entirety, Plaintiff be granted leave to further amend the complaint. *See* Pl. Opp. at 17. "The court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)). "Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim." *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 224–25 (2d Cir. 2017). "Repeated failure to cure deficiencies by amendments previously allowed" warrants denial of leave to amend. *Dluhos v. Floating and Abandoned Vessel, Known as New York*, 162 F.3d 63, 69 (2d Cir. 1998). "In general, when assessing whether an amended complaint would state a claim, we consider the proposed amendments along with the remainder of the complaint." *Pyskaty*, 856 F.3d at 225. "Although courts commonly look to proposed amendments to determine futility, . . . courts may consider all possible amendments when determining futility." *Panther Partners Inc. v. Ikanos Commun., Inc.*, 347 F. App'x 617, 622 (2d Cir. 2009) (unpublished).

Plaintiff has had four opportunities over four years to plead her claims, with the aid of multiple opinions specifically outlining the deficiencies in the prior pleadings. *See generally* Dkt. No. 117, Prior MTD Opinion, Recon. Opinion, LTA Order. "Generally, a plaintiff's failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to amend." *Earl v. Good Samaritan Hosp. of Suffern NY*, 625 F. Supp. 3d 292, 308 (S.D.N.Y. 2022), *aff'd*, No. 22-2505-cv, 2023 WL 8708417 (2d Cir. Dec. 18, 2023). Plaintiff offers

no proposed amendments that would cure the deficiencies identified.  The Court finds that a fifth opportunity would be futile and would unduly prejudice Defendants.  Therefore, Plaintiff's application for leave to amend the complaint to cure the deficiencies identified in this opinion is denied.

## VI.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Plaintiff's Third Amended Complaint is GRANTED IN PART and DENIED IN PART.  Plaintiff's § 1983 claim for a violation of her Equal Protection rights and her § 1985 claim are dismissed as to Defendants Egan, Hinds, and Williams with prejudice.  Plaintiff has adequately pleaded a § 1983 claim for a violation of her Equal Protection rights and a § 1985 claim against the UFT and Woodruff.  The Clerk of Court is directed to terminate the motion pending at Dkt. No. 150.

SO ORDERED.

Dated: July 14, 2025
    New York, New York

_____
GREGORY H. WOODS
United States District Judge